44 F.3d 489
 Kun Chae BAE, Petitioner,
v.
Donna E. SHALALA, Secretary of the United States Department
of Health and Human Services and David Kessler,
Commissioner of the United States Food
and Drug Administration, Respondents.
 No. 94-1373.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 8, 1994.
Decided Jan. 4, 1995.
 
 Ann C. Tighe, Cotsirilos, Stephenson, Tighe & Streicker, Steven M. Kowal (argued), Burditt & Radzius, Chicago, IL, for petitioner.
 Donna Morros Weinstein, Dept. of Health and Human Services, Region V, Office of the Gen. Counsel, Chicago, IL, Douglas Letter, Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, Eric M. Blumberg, Federal Drug Admin., Rockville, MD, Donna E. Shalala, Dept. of Health and Human Services, Washington, DC, Margaret Porter, Annamarie Kempic, Andrew Clark, Lawrence G. McDade (argued), Dept. of Health & Human Services, Chief Counsel, Food & Drug Div., Rockville, MD, for Donna E. Shalala.
 Douglas Letter, Dept. of Justice, Civ. Div., Appellate Section, Washington, DC, Eric M. Blumberg, David Kessler, Federal Drug Admin., Rockville, MD, Margaret Porter, Annamarie Kempic, Andrew Clark, Lawrence G. McDade, Dept. of Health & Human Services, Chief Counsel, Food & Drug Div., Rockville, MD, for David Kessler.
 Before COFFEY and ROVNER, Circuit Judges, and FOREMAN, District Judge.*
 COFFEY, Circuit Judge.
 
 
 1
 Petitioner Kun Chae Bae, the former president of a generic drug manufacturing company, appeals the final order of the Food and Drug Administration ("FDA") under the Generic Drug Enforcement Act of 1992 ("GDEA"), 21 U.S.C. Secs. 335a-335c, permanently debarring him from "providing services in any capacity to a person that has an approved or pending drug product application." The GDEA mandates permanent debarment for any individual "convicted of a felony under [f]ederal law for conduct ... relating to the development or approval, ... or ... [other] regulation of any drug product" under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. Secs. 301-395.[1] The FDA debarred Bae because of his 1990 felony conviction for aiding and abetting interstate travel in aid of racketeering, which arose from allegations that, in 1987, Bae provided an FDA official with an "unlawful gratuity" in exchange for "official acts performed and to be performed" by the FDA official. This case presents the question of whether and under what circumstances a civil debarment penalty may constitute retroactive punishment prohibited by the Ex Post Facto Clause of the United States Constitution.[2] We affirm.
 
 I. BACKGROUND
 
 2
 From 1973 through 1988, Bae was the president of My-K Laboratories, Inc., a generic drug manufacturing company located in suburban Chicago, Illinois. My-K Laboratories, like other generic drug manufacturers, sought FDA approval to market generic copies of previously approved drugs through the submission of abbreviated new drug applications. The 1984 amendments to the Federal Food, Drug, and Cosmetic Act authorized generic drug manufacturers, through the submission of abbreviated new drug applications, to rely on the FDA's prior determination of the safety and effectiveness of an innovator's drug, provided that the manufacturer demonstrated that the generic copy was fundamentally identical or "bioequivalent" to the innovator's pharmaceutical product. See 21 U.S.C. Sec. 355(j).
 
 
 3
 While president of My-K Laboratories, Bae submitted several abbreviated new drug applications to the FDA's Division of Generic Drugs. This division was composed of four chemistry review branches responsible for determining whether the manufacturing procedures and analytical controls described in the abbreviated new drug applications were adequate to assure the identity, strength, quality and purity of the drug products. Charles Y. Chang, the Branch Chief of the FDA's chemistry review branch in Maryland, was responsible for supervising the chemists who evaluated My-K Laboratories' abbreviated new drug applications. Bae frequently consulted with Chang concerning the status of My-K Laboratories' new drug applications and sought advice from Chang on how to resolve various problems as they arose.
 
 
 4
 On two occasions, once in the summer of 1986 and once in the summer of 1987, Bae invited Chang to visit Bae's country home in Illinois. On each of these visits, Bae gave Chang $10,000 in United States currency.
 
 
 5
 After Bae sold his interest in My-K Laboratories in 1988, he became the subject of an investigation of irregularities concerning the FDA's drug approval process. In 1990, Bae was charged with and pleaded guilty to one felony count of aiding and abetting interstate travel in aid of racketeering, in violation of 18 U.S.C. Secs. 1952 and 2. The Information[3] alleged that on or about August 21, 1987, Bae caused FDA Branch Chief Charles Y. Chang to travel from Maryland to Illinois with the intent to provide Chang with an "unlawful gratuity." The Information further alleged that during Chang's visit to Illinois, Bae gave Chang $10,000 "for and because of official acts performed and to be performed" by Chang. The statement of facts accompanying the Information asserted that Chang provided Bae "with several formulations for generic drugs which Chang had gleaned from other companies' [applications]."
 
 
 6
 By certified letter dated March 30, 1993, the FDA notified Bae that it proposed to debar him from participation in the generic drug industry pursuant to 21 U.S.C. Sec. 335a(a)(2) based on his prior felony conviction for conduct relating to the development or approval of a generic drug product. The FDA notified Bae that he would have the opportunity for an evidentiary hearing, should he desire to contest his debarment, if he presented specific facts, in writing, demonstrating a genuine and substantial issue of fact relevant to his debarment. Bae requested a hearing, but submitted no specific facts, and instead raised the argument that the GDEA's debarment provision was punitive in nature, and that its retroactive application to him violated the constitutional prohibition against ex post facto laws. The FDA, after reviewing Bae's request for a hearing, denied the request, finding that Bae had failed to raise any genuine or substantial issue of fact relevant to his debarment. On December 30, 1993, the FDA issued a final order permanently debarring Bae from providing services in any capacity to a person with a pending or approved drug product application. 58 Fed.Reg. 69,368 (Food & Drug Admin.1993).
 
 II. DISCUSSION
 
 7
 The Administrative Procedure Act, 5 U.S.C. Secs. 701-706, governs our review of an action taken by an administrative agency. Bae's challenge to the FDA's debarment order raises a pure question of law: whether the retroactive application of the debarment penalty of the GDEA violates the Constitution's prohibition against ex post facto laws. Our review of this question is de novo. See 5 U.S.C. Sec. 706; Director, Office of Workers' Compensation Programs v. Ball, 826 F.2d 603, 604 (7th Cir.1987).
 
 
 8
 The Ex Post Facto Clause of the United States Constitution, Article I, Sec. 9, clause 3, prohibits the enactment of any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325-26, 18 L.Ed. 356 (1867); Dehainaut v. Pena, 32 F.3d 1066, 1073 (7th Cir.1994) (quoting Inglese v. United States Parole Comm'n, 768 F.2d 932, 934 (7th Cir.1985)). "[F]or a criminal or penal law to be ex post facto ... it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver v. Graham, 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981).
 
 
 9
 A civil sanction, like the debarment provision of the GDEA, will implicate ex post facto concerns only if it can fairly be characterized as punishment. United States v. Halper, 490 U.S. 435, 447-48, 109 S.Ct. 1892, 1901-02, 104 L.Ed.2d 487 (1989); see In re Kurth Ranch, 986 F.2d 1308, 1309 (9th Cir.1993), aff'd sub nom. Department of Revenue v. Kurth Ranch, --- U.S. ----, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) ("a criminal penalty by any other name is still a criminal penalty").
 
 
 10
 The mark of an ex post facto law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession.
 
 
 11
 DeVeau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960).
 
 
 12
 In Halper, the Supreme Court described the proper analysis to determine whether a given civil sanction constitutes punishment in the constitutional sense:
 
 
 13
 It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties.... The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law, and for the purposes of assessing whether a given sanction constitutes multiple punishment barred by the Double Jeopardy Clause, we must follow the notion where it leads.... To that end, the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment.
 
 
 14
 ....
 
 
 15
 We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence.... [I]t follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.... We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.
 
 
 16
 Halper, 490 U.S. at 447-49, 109 S.Ct. at 1901-02 (citations and footnotes omitted).
 
 
 17
 The aim of the GDEA was to restore consumer confidence in generic drugs by eradicating the widespread corruption in the generic drug approval process. The preamble to the GDEA focuses exclusively on its remedial purpose, i.e., "to restore and to ensure the integrity of the abbreviated drug application approval process and to protect the public health." Pub.L. 102-282, Sec. 1(c). Enactment of the GDEA was prompted by the 1988 investigation that revealed the crimes of Bae and others in connection with the FDA's generic drug approval process. The drafters of the GDEA recognized "a need to establish procedures to bar individuals who have been convicted of crimes pertaining to the regulation of drug products from working for companies that manufacture or distribute such products." Pub.L. 102-282, Sec. 1(c). With these objective goals, the GDEA can fairly be said solely to serve a remedial purpose.
 
 
 18
 Bae argues that a civil sanction that serves both remedial and punitive goals must be characterized as punishment. See Halper, 490 U.S. at 448, 109 S.Ct. at 1902 ("a civil sanction that cannot fairly be said solely to serve a remedial purpose ... is punishment") (emphasis added). Bae contends that debarment cannot be said to serve solely remedial purposes because debarment is triggered only by a criminal conviction, and the only basis for limiting or terminating an otherwise permanent debarment is to provide substantial assistance to the government in other criminal prosecutions. We refuse to read Halper so broadly. A civil sanction that can fairly be said solely to serve remedial goals will not fail under ex post facto scrutiny simply because it is consistent with punitive goals as well. A civil sanction will be deemed to be punishment in the constitutional sense only if the sanction "may not fairly be characterized as remedial, but only as a deterrent or retribution." Halper, 490 U.S. at 449, 109 S.Ct. at 1902 (emphasis added); but see Manocchio v. Kusserow, 961 F.2d 1539, 1542 (11th Cir.1992) (primary goal of civil sanction was remedial; existence of secondary punitive goal did not defeat characterization of sanction as remedial). Without question, the GDEA serves compelling governmental interests unrelated to punishment. The punitive effects of the GDEA are merely incidental to its overriding purpose to safeguard the integrity of the generic drug industry while protecting public health.
 
 
 19
 Our inquiry does not end here. We must also determine whether the legislative history of the GDEA evinces an intent to punish. Dehainaut, 32 F.3d at 1072. Bae points out that the legislators who sponsored the GDEA repeatedly sought support for the bill in the name of deterrence. Congressman Dingell argued before the House of Representatives that "[the GDEA] is intended to protect the integrity of the generic drug approval process, to restore consumer confidence in generic drugs, and to create a strong deterrent to future misconduct." 137 Cong.Rec. H8552-01, H8557 (daily ed. Oct. 28, 1991). Senator Kennedy echoed these goals to the Senate: "[The GDEA] provides the FDA with the ability ... to protect the drug approval process and the regulation of drug products. Most importantly, it will deter future criminal acts that might threaten not only drug approval and regulations, but the public health." 138 Cong.Rec. S5614-02, S5615 (daily ed. April 10, 1992). During one congressional hearing, Congressman Dingell mentioned Bae by name:
 
 
 20
 When Kun Chae Bae, currently incarcerated for paying off FDA chemists and Defense Department procurement personnel, sold MY-K Laboratories to Pharmaceutical Basics, Incorporated in 1988, he reportedly walked away with $20 million. He is currently serving 60 days in a half-way house. It would appear that he might perhaps have gotten a more worthy sentence, but at least he is occupied and out of the business for that period of time.
 
 
 21
 FDA's Generic Drug Enforcement and Approval Process, 1991: Hearings Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce, 102d Cong., 1st Sess. 3 (1991) (statement of Rep. John D. Dingell, Chairman).
 
 
 22
 Even though the legislative history of the GDEA is replete with references to its deterrent objective, we are unconvinced that Congress, as a whole, intended the mandatory debarment provision of the GDEA to serve solely punitive goals. In Manocchio, the Eleventh Circuit explained that
 
 
 23
 [w]hile the desire to provide a deterrent is a punitive goal, we find that the legislative history, taken as a whole, demonstrates that the primary goal of the legislation is to protect present and future Medicare beneficiaries from the abusers of these programs. Therefore, since the legislative intent of the exclusionary period is to protect the public, the sanction is remedial, not punitive.
 
 
 24
 Manocchio, 961 F.2d at 1542. The Supreme Court has consistently required "unmistakable evidence of punitive intent" to characterize a sanction as punishment. Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 855 n. 15, 104 S.Ct. 3348, n. 15, 82 L.Ed.2d 632 (1984); Flemming v. Nestor, 363 U.S. 603, 619, 80 S.Ct. 1367, 1377, 4 L.Ed.2d 1435 (1960). The isolated statements of the GDEA's sponsors do not constitute such "unmistakable evidence." We cannot construe the subjective intent expressed by one or more legislators to reflect the objective intent of Congress. See Selective Service, 468 U.S. at 855 n. 15, 104 S.Ct. at 3357 n. 15 ("several isolated statements" by legislators "indignant over the decision of some nonregistrants to show their defiance of the law" held to be insufficient evidence of punitive intent); see also Wiley v. Bowen, 824 F.2d 1120, 1122 (D.C.Cir.1987) ("we cannot lightly attribute to the Congress as a whole the impermissible motives of a few of its members"). Moreover, reliance on statements made by politicians in their efforts to persuade colleagues to enact a law is a wholly unreliable method for determining the nature of a sanction. In this context, the Supreme Court has warned that "[j]udicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed." Flemming, 363 U.S. at 617, 80 S.Ct. at 1376.
 
 
 25
 In Halper, the Supreme Court noted that "punishment serves the twin aims of retribution and deterrence." Halper, 490 U.S. at 448, 109 S.Ct. at 1901. However, the converse is not true: a deterrent purpose does not automatically mark a civil sanction as a form of punishment. Kurth Ranch, --- U.S. at ----, 114 S.Ct. at 1946. General deterrence is the foremost and overriding goal of all laws, both civil and criminal, and transcends the nature of any sanction. General deterrence aims to dissuade all persons from violating the laws. In contrast, specific or special deterrence aims to change a particular individual's behavior through negative reinforcement. During the congressional hearings and debates on the GDEA, various members of Congress repeatedly assured that the GDEA would "create a strong deterrent to future misconduct." (Emphasis added.) We are convinced that these statements reflect an intent to further the goal of general deterrence.
 
 
 26
 Bae finally argues that his permanent debarment is overwhelmingly disproportionate to the remedial goals of the GDEA. In Halper, the Supreme Court explained that
 
 
 27
 [t]he rule is one of reason: Where a defendant previously has sustained a criminal penalty and the civil penalty sought in the subsequent proceeding bears no rational relation to the goal of compensating the Government for its loss, but rather appears to qualify as "punishment" in the plain meaning of the word, then the defendant is entitled to an accounting of the Government's damages and costs to determine if the penalty sought in fact constitutes a second punishment.
 
 
 28
 Halper, 490 U.S. at 449-50, 109 S.Ct. at 1902 (emphasis added); see also United States v. Furlett, 974 F.2d 839, 843 (7th Cir.1992) ("the civil penalty need not correspond precisely to the government's loss to qualify as remedial ... liquidated damages and other forms of 'rough justice' may be imposed on top of criminal penalties so long as they bear a reasonable relationship to the government's loss"). Unlike the monetary sanctions challenged in Halper and Kurth Ranch, a debarment penalty is nearly impossible to quantify. Nonetheless, we must determine whether Bae's permanent debarment from participation in the generic drug industry "reasonably can be viewed as a remedial measure commensurate with his wrongdoing." Furlett, 974 F.2d at 844.
 
 
 29
 A number of appellate courts have upheld debarments and other similar employment restrictions to serve nonpunitive, remedial goals. See United States v. Hudson, 14 F.3d 536 (10th Cir.1994) (administrative sanctions levied against bankers that included agreement that bankers would not participate in banking activities without permission of Comptroller of Currency were remedial); Manocchio, 961 F.2d at 1539 (statute mandating five year exclusion from participation in Medicare program of physician convicted of filing fraudulent Medicare claim was remedial); United States v. Reed, 937 F.2d 575 (11th Cir.1991) (thirty-day disciplinary suspension of postal employee was remedial); United States v. Bizzell, 921 F.2d 263 (10th Cir.1990) (civil sanctions that included two-year exclusion of individuals from all Housing and Urban Development programs were remedial).
 
 
 30
 The employment restrictions imposed in Manocchio, Reed, and Bizzell were of limited duration. Similarly, the restriction in Hudson could be lifted if administrative consent were obtained. In contrast, petitioner Bae's debarment is permanent. However, the duration or severity of an employment restriction will not mark it as punishment where it is intended to further a legitimate governmental purpose. This court has twice upheld permanent employment bans against double jeopardy and ex post facto challenges. In Dehainaut,[4] we affirmed the Office of Personnel Management's policy of indefinitely barring former air traffic controllers, who had been discharged for participating in a strike, from reemployment with the Federal Aviation Administration. We explained that
 
 
 31
 [e]ven where a fixed identifiable group ... is singled out and a burden traditionally associated with punishment--such as permanent exclusion from an occupation--is imposed, the enactment may pass [constitutional] scrutiny ... if it seeks to achieve legitimate and non-punitive ends and was not clearly the product of punitive intent.
 
 
 32
 Dehainaut, 32 F.3d at 1071. In Furlett,[5] we upheld as a remedial measure an administrative law judge's imposition of an absolute trading ban on a commodities trader charged with fraud and conspiracy.
 
 
 33
 [T]he decision to exclude Furlett from any contract market can be seen as an action to ensure the integrity of the markets and protect them from people like Furlett. Commodities and instruments representing billions of dollars are traded in the nation's contract markets every year. Maintaining a fair and unadulterated open market is a profound and necessary pursuit for our economic well-being. If fraudulent practices undermining the integrity of the markets were to proceed unchecked, the vital efficiency of the market mechanism would be jeopardized.
 
 Furlett, 974 F.2d at 844.[6]
 
 34
 In enacting the GDEA, Congress adopted a bright-line rule excluding from the generic drug industry all individuals with prior felony convictions relating to the approval or regulation of any generic drug product. Although Bae's permanent debarment from providing services in any capacity to a person with an approved or pending drug product application is undoubtedly harsh, it is not disproportionate to the remedial goals of the GDEA or to the magnitude of his wrongdoing. Bae's actions were both unlawful and unscrupulous. Bae lined the pockets of a high-ranking FDA official with thousands of dollars in exchange for information or preferential treatment. His contribution to the widespread corruption in the generic drug industry was by no means slight. We agree with the Tenth Circuit that
 
 
 35
 [i]t is the clear intent of debarment to purge government programs of corrupt influences and to prevent improper dissipation of public funds. Removal of persons whose participation in these programs is detrimental to public purposes is remedial by definition. While those persons may interpret debarment as punitive, and indeed feel as though they have been punished, debarment constitutes the "rough remedial justice" permissible as a prophylactic governmental action.
 
 
 36
 Bizzell, 921 F.2d at 267.
 
 
 37
 One final point deserves brief mention. In ruling on whether the GDEA's mandatory debarment provision imposes retroactive punishment prohibited as an ex post facto law, we have not followed the test set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). In Mendoza-Martinez, the Supreme Court listed those factors to be considered to determine whether a civil penalty divesting an individual's citizenship was in effect a criminal penalty requiring the procedural safeguards of the Fifth and Sixth Amendments.
 
 
 38
 Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment--retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. Absent conclusive evidence of congressional intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face.
 
 
 39
 Id. at 168-69, 83 S.Ct. at 567-68 (footnotes omitted); see also United States v. Ward, 448 U.S. 242, 249-50, 100 S.Ct. 2636, 2641-42, 65 L.Ed.2d 742 (1980). In deciding the related, but independent, question of whether a civil sanction imposes punishment, the Supreme Court has refused to apply the Mendoza-Martinez test. In Halper, the Court explained that
 
 
 40
 [t]he question in [Mendoza-Martinez and Ward ] was whether a nominally civil penalty should be reclassified as criminal and the safeguards that attend a criminal prosecution should be required.... In addressing the separate question whether punishment is being imposed, the Court has not employed the test articulated in Mendoza-Martinez and Ward. See, e.g., United States v. Halper, 490 U.S. 435, 447, 109 S.Ct. 1892, 1901, 104 L.Ed.2d 487 (1989). Since in this case we deal only with the question whether the Eighth Amendment's Excessive Fines Clause applies, we need not address the application of those tests.
 
 
 41
 Austin v. United States, --- U.S. ----, ---- n. 6, 113 S.Ct. 2801, 2806 n. 6, 125 L.Ed.2d 488 (1993) (citations omitted). Our determination in this case of the nature of a civil sanction under the Ex Post Facto Clause closely parallels the Supreme Court's determination in Austin of a similar question under the Excessive Fines Clause. We have accordingly limited our analysis to those considerations described in Halper.
 
 III. CONCLUSION
 
 42
 By enacting the mandatory debarment provision of the GDEA, Congress sought not to punish Kun Chae Bae but to safeguard the integrity of the generic drug industry. The clear and unambiguous intent of Congress in passing the GDEA was to purge the generic drug industry of corruption and to restore consumer confidence in generic drug products. The GDEA's civil debarment penalty is solely remedial, even though it "carries the sting of punishment" in the eyes of petitioner Bae. See Halper, 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7; Hudson, 14 F.3d at 540. Accordingly, the FDA's final order permanently debarring Bae from providing services in any capacity to a person with an approved or pending drug product application is
 
 
 43
 AFFIRMED.
 
 
 
 *
 The Honorable James L. Foreman, of the Southern District of Illinois, is sitting by designation
 
 
 [1]
 Section 335a(a)(2) provides that
 [i]f the Secretary finds that an individual has been convicted of a felony under Federal law for conduct--(A) relating to the development or approval, including the process for development or approval, of any drug product, or (B) otherwise relating to the regulation of any drug product under this chapter, the Secretary shall debar such individual from providing services in any capacity to a person that has an approved or pending drug product application.
 
 
 [2]
 Petitioner Bae has made no argument that the GDEA cannot be applied retroactively as a matter of statutory construction. See Landgraf v. USI Film Products, --- U.S. ----, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Accordingly, we are expressing no opinion as to that issue
 
 
 [3]
 Bae waived his right to indictment
 
 
 [4]
 The plaintiffs in Dehainaut challenged the permanent employment ban as a bill of attainder and ex post facto law
 
 
 [5]
 The defendant in Furlett challenged his trading ban under the Double Jeopardy Clause
 
 
 [6]
 Bae contends that Furlett is distinguishable because the Commodities Exchange Act, 7 U.S.C. Sec. 9, which governed Furlett's exclusion from the contract markets, required a hearing at which an administrative law judge made an individualized determination of the seriousness of Furlett's conduct. See Furlett, 974 F.2d at 841. The GDEA makes no provision for a hearing to determine whether an individual with a prior felony conviction would pose a current threat to the integrity of the generic drug industry. This does not alter our conclusion that the debarment provision is remedial in nature. The decision to require the mandatory, permanent debarment of persons with certain prior felony convictions, without inquiry into the individual circumstances of those debarred, does not reflect any punitive intent. Cf. Dehainaut, 32 F.3d at 1069-73 (upholding indefinite Federal Aviation Administration employment ban for former air traffic controllers without individualized assessment of current integrity)