**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dale K. WINGATE, Defendant–Appellant.**

No. 96–4035.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1997.

Decided Nov. 5, 1997.

Richard C. Pilger (argued), Department of Justice Criminal Division, Public Integrity Sect., Washington, DC, for Plaintiff–Appellee.

M. Jacqueline Walther (argued), Kielian & Walther, Chicago, IL, George P. Lynch, Lisle, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and MANION and DIANE P. WOOD, Circuit Judges.

MANION, Circuit Judge.

Dale Wingate, a Special Agent employed by the United States Immigration and Naturalization Service (INS), was indicted for depriving the INS of his honest services. Wingate was accused of providing unauthorized governmental benefits to persons who previously, or might in the future, assist Wingate to adopt children. A jury convicted Wingate on one count each of mail fraud, wire fraud, and harboring an illegal alien, and two counts of transporting an illegal alien. Wingate appeals his conviction; we affirm.

## I.

The facts drawn from the record in this jury trial and all reasonable inferences therefrom we view in a light most favorable to the government. *United States v. Katalinich*, 113 F.3d 1475, 1480 (7th Cir.1997). Dale Wingate began his career in the INS in 1976 as a Special Agent, and during his career at the INS, he was promoted to Special Agent in the Chicago office of the fraud unit of the investigation branch of the INS. Prior to that, he served in the Vietnam War, and remains an army reservist. Special Agents are law enforcement officials: they carry badges; they work with informants and other information sources to discover illegal aliens; and they make arrests of persons violating U.S. immigration law.

In 1989, Wingate and his second wife, Susan, went to Lima, Peru, and adopted twin girls from a Peruvian national named Martha Oncebay. The Wingates then returned to the United States with their new daughters. Two years later, Oncebay was expecting another child, and the Wingates provided her with a round-trip airline ticket to come to the United States. On October 20, 1991, Susan Wingate admitted Oncebay to an Indiana hospital. On October 21, 1991, Wingate arrived in Indiana from California, where he

was serving in the military due to Desert Storm, and went to the hospital. He showed his badge as identification, represented to the admitting clerk that his wife Susan was having a baby, and sought insurance coverage for the delivery. The hospital later discovered that Oncebay, not Susan Wingate, was having the baby, and changed the medical records to reflect this. That same day, Oncebay delivered a baby boy. The Wingates adopted this baby.

After the adoption Oncebay stayed in the United States, residing in Miami, Florida for a time. In July 1993, after her visa had expired, she returned to Indiana, where Wingate provided additional help to her. He and his family members transported Oncebay to her daily job at the Oneida Mexican Restaurant in Valparaiso, Indiana. Without proper authorization, Wingate provided Oncebay with a Voluntary Departure Notice, known as an I–210 form, which purported to authorize her to remain in the United States until July 11, 1994. Oncebay lived with the Wingates for at least part of the summer in 1993.

While in Miami, Oncebay had obtained a restricted Social Security card that did not authorize her to work in the United States. During the summer of 1993, Wingate accompanied Oncebay to the Social Security Administration Office in Hammond, Indiana to obtain a replacement Social Security card. Wingate displayed his badge to an SSA employee, and stated that Oncebay was entitled to a new Social Security card authorizing her to work.[1] The agent processed the request for the replacement Social Security card, which included the provision that Oncebay was authorized to work in the United States. The agent then directed the card to be mailed in Oncebay's name to the Wingates' home address. Oncebay was not legally authorized to work, and without the replacement card, no employer could hire her.

In late summer 1993, while on a family vacation, Wingate transported Oncebay to Moline, Illinois, in an attempt to secure employment for her at the IBP meat processing plant. Upon arriving in Moline, the Wingates and Oncebay met with Father Manuel Munoz, a Catholic priest. Many of Munoz's congregation worked at IBP. Wingate, Oncebay, and Munoz all went to IBP, but only Wingate and Oncebay actually went to the interview.

Wingate filled out the application for Oncebay, filling in the information that he knew and asking her for other information. Randy Kundert, the employment manager, questioned the INS documentation and work authorization papers which Wingate had previously provided to Oncebay. At that point, Wingate identified himself as a Special Agent of the INS, displayed his badge, and represented that Oncebay was a legal alien and authorized to work in the United States. After completing the application process and interview, Wingate left Oncebay with Munoz and returned to Indiana. Shortly thereafter, Munoz called the Wingate residence and told Susan that Oncebay was not hired by IBP. Oncebay then returned to Chesterton, Indiana.

Because Kundert remained suspicious of the documentation produced by Oncebay and Wingate, he contacted the INS. This led to Oncebay's arrest and the eventual indictment of Wingate on five counts: wire fraud (the telephone call from Munoz to the Wingate residence); mail fraud (the mailing of the Social Security card to Oncebay at Wingate's address); harboring an illegal alien; and two counts of transporting an illegal alien.

Wingate also abused his authority with regard to other illegal aliens. In early March, 1993, Wingate improperly provided Marcela Burgos, an Ecuadorian national, a memorandum stating that she was authorized to remain and work in the United States. On September 8, 1993, Burgos faced deportation proceedings. Wingate convinced the attorney prosecuting the deportation that Burgos was an INS informant, which she was not.[2] The attorney requested that the immi-

---

1. The record does not reveal the status of her first Social Security card when she got the new one.

2. Burgos testified that Wingate addressed the administrative law judge; Seth Fitters, the INS attorney, testified that he did not. The discrepancy, however, is irrelevant: Wingate was not accused of perjuring himself in court.

gration judge close the case without deporting Burgos, which the judge did. After Wingate and Burgos left the courtroom, Wingate commented that he wanted to bring some girls from Ecuador.

Wingate also abused his position and influence with the INS with respect to Jorge Diaz, a Peruvian national. Diaz entered the United States illegally in 1989, and was subsequently arrested and scheduled for deportation. Diaz obtained Wingate's business card through a friend with the Peruvian juvenile police, who got the card around the time Wingate adopted two children in Peru. Diaz contacted Wingate, and Wingate obtained a work authorization card for Diaz. testified that he did not provide the information attributed to him and found in Diaz's informant records prepared by Wingate. Nevertheless, Diaz's work authorization card was renewed from 1990 until 1993.

Attorney Roderick F. Mollison represented Wingate from the beginning of the case through his first trial. Prior to the first trial, Mollison entered into a written stipulation with the government which stated that the INS's records would show that Oncebay did not claim to be a U.S. citizen, that she entered the United States from Peru on October 6, 1991, on a visitor's visa for the purpose of pleasure, and that the visa would expire on April 5, 1992. This stipulation was entered without objection in the first trial. The jury in the first trial deadlocked, and the district court declared a mistrial.

Wingate retained new counsel, George P. Lynch, for the second trial. Prior to the second trial, the defendant brought a motion to dismiss the indictment because it was barred by the Double Jeopardy clause of the Fifth Amendment. He claimed that the INS had already punished him by suspending him without pay, and that a criminal conviction would be a second punishment for the same offense. The district court denied the motion, holding that INS's suspension and termination of Wingate after the indictment was remedial, and did not constitute punishment in the constitutional sense. At the end of the first day of the second trial, Wingate's attorney objected to the entry of the stipulation regarding the contents of the INS file on Oncebay. The district court held its ruling in abeyance overnight to allow Wingate's attorney to research the question of why Wingate should be released from the stipulation. Counsel did not offer any further argument the next morning, and the district court declined to release Wingate from the stipulation.

The jury convicted Wingate on all counts, and the district court sentenced Wingate to 15 months' incarceration and two years' supervised release on each count, to run concurrently. Wingate appeals, claiming the district court abused his discretion in admitting the stipulation, that the mailing and telephone call did not further the scheme alleged, and that the conviction is barred by the Double Jeopardy clause. Wingate does not challenge the sufficiency of the evidence establishing the one count of harboring an alien or the two counts of transporting an alien.

## II.

**A.**

 At trial, Wingate argued that entering the stipulation denied him the right to confront witnesses under the Sixth Amendment. The district court allowed the stipulation to be entered over Wingate's objection. After trial, Wingate moved for post-trial relief and presented an affidavit stating that Mollison entered into the stipulation despite Wingate's objection to it.

 "[O]nce made, a stipulation is binding unless relief from the stipulation is necessary to avoid 'manifest injustice' or the stipulation was entered into through inadvertence or based on an erroneous view of the facts or law." *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1206 (7th Cir.1989). The district court's decision to hold the defendant to his stipulation will be upheld unless "the court has clearly and unmistakably abused its discretion." *Id.*

 Wingate argues that this holding is inapplicable in criminal cases involving constitutional rights. However, there appears to be no support for this proposition. In *United States v. Kramer*, 955 F.2d 479, 492

(7th Cir.1992), we applied the *Graefenhain* test in sustaining the district court's decision to release the government from a stipulation made before a trial of two defendants was severed. District courts have broad discretion to manage trials, *id.* at 492; *Graefenhain*, 870 F.2d at 1206, and this includes holding defendants to their stipulations, even regarding essential elements of proof, in the absence of manifest injustice, inadvertence or a mistake as to the law or facts of the case.

In the alternative, Wingate claims that even under the *Graefenhain* test the court erred in holding him to the stipulation. Perhaps manifest injustice could be shown if Wingate demonstrated that Oncebay was in fact legally in the United States; Wingate, however, has not made any showing, or even argument, that such was the case. Similarly, Wingate does not argue that he made a mistake as to the facts or the law of the case. Wingate does argue that he inadvertently assumed that Oncebay would be called as a witness because the government provided Oncebay's address to him, and because he operated under that assumption, he did not seek to set aside the stipulation. Wingate and his counsel cannot rely on this assumption. At the beginning of the trial, the district court asked the government if Oncebay would testify. The government stated unambiguously "No, your honor." At that point Wingate's counsel did not protest or ask to be relieved from the stipulation, despite the fact that he was aware of the stipulation entered into by Wingate's counsel before the first trial. Additionally, the government stated that it relied on the stipulation in preparing its case; the trial court could properly take into account that reliance. The district court did not clearly or unmistakably abuse its discretion in admitting the stipulation.

Even if, however, the defendant could establish that the district court abused its discretion, the error would have been harmless. *United States v. Kiser*, 948 F.2d 418, 425 (8th Cir.1991) (defense counsel's stipulation of the authenticity of business records was held to be harmless where there was no factual basis to dispute the validity of the records). The government entered the INS records pertaining to Oncebay. These records in fact show everything the stipulation provides that they do: namely, that Oncebay entered the United States in 1991 on a visitor's visa, and that her visa would expire in 1992. The actual INS documents entered into the record (before Wingate objected to the stipulation) clearly establish the substance of the stipulation, and were uncontroverted at trial. As a result, the defendant was not prejudiced by the entry of the stipulation. This also overrides any claim that attorney Mollison was not authorized to enter into the stipulation, or that Wingate received ineffective assistance of counsel.

Perhaps Wingate could argue that the stipulation was cumulative, but even if it were, the stipulation would have to be so prejudicial as to taint the trial. *See Holmes v. Elgin, Joliet & Eastern Ry. Co.*, 18 F.3d 1393, 1397 (7th Cir.1994) ("[I]f an error is deemed harmless, reversal is inappropriate. Admission of cumulative evidence does not merit reversal absent a showing of prejudice."). The stipulation merely covered what the INS records show. The stipulation did not concede the truth of the information, and did not preclude the defendant from attempting to establish the inaccuracy of the file. Given that the actual INS file on Oncebay was admitted, the entry of the stipulation covering the same evidence would have a negligible effect on the trial, and does not mandate reversal.

**B.**

Wingate does not contest that the government proved a scheme to defraud the government, but he argues that the mailing and telephone call charged did not further the scheme alleged in the indictment. He claims that because two years passed between his adopting Oncebay's last child and the charged telephone call and mailing, the charged acts are too remote and too attenuated from any conduct by Oncebay to further any scheme.

In "most cases this element [of the mailing being in furtherance of the scheme to defraud] is fairly easy to satisfy," *United States v. Hickok*, 77 F.3d 992, 1004 (7th

Cir.1996), and this case is no exception.[3] The telephone call and mailing need only be incidental to an essential part of the scheme to further the scheme. *Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1447–48, 103 L.Ed.2d 734 (1989). In fact, the acts need only be reasonably foreseeable to the defendant; the defendant himself did not actually have to place the phone call or use the mails. *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir.1992); *United States v. Galloway*, 664 F.2d 161, 162 (7th Cir.1981). However, a mailing or telephone call is not in furtherance of a scheme when it occurs after the scheme has reached fruition. *United States v. McClellan*, 868 F.2d 210, 216 (7th Cir.1989).

Wingate misconstrues the scheme the government alleged and proved. The scheme alleged in the indictment was Wingate's abuse of his position and influence as a Special Agent of the INS to give unauthorized government benefits and documents to illegal aliens as a reward for those who have in the past or might in the future facilitate the Wingates' adoption of children. Wingate argues that this was not a quid pro quo: He had already adopted Oncebay's children and did not expect to receive anything more from Oncebay. However, this argument does not negate the fact that Oncebay did place her children with the Wingates, and that Wingate's illicit use of his authority did benefit her. Given that this was the scheme charged, Wingate's procurement of a Social Security card that was mailed to Oncebay clearly furthers the scheme. Oncebay was not entitled to a Social Security card; yet the card would provide important documentation for her to live and work in the United States. A jury could reasonably infer from the evidence at trial, including the Wingates' fre-

quent contact with Oncebay in the summer of 1993, and their desire to adopt more children, that these benefits were given to Oncebay specifically because of her relationship to the Wingate family, and thus furthered the scheme alleged. And the mailing kept her from being exposed to further investigation that could lead back to Wingate.

The same analysis is applicable to the telephone call charged in the indictment. Munoz telephoned Wingate to notify him that Oncebay was not hired at the meat processing plant, thus causing Wingate to transport her back to Chesterton, Indiana where he would continue to harbor her in his home, knowing that she was an illegal alien. The telephone call, made in 1993, was sufficiently close in time and related to the scheme to defraud the government of Wingate's honest services.[4]

Additionally, while the mailing of the Social Security card and the call from Munoz occurred nearly two years after the adoption of Oncebay's youngest child, they immediately followed instances in which Wingate had represented himself as an INS agent, and had represented that Oncebay was authorized to work in the United States. Like the mailing in *United States v. Koen*, 982 F.2d at 1110, the mailing of the Social Security card and telephone call allowed the scheme of defrauding the government of Wingate's honest services to continue. Perhaps, if the SSA had sent a letter refusing to issue a Social Security card, or if the telephone call had been made to enable the arrest of Oncebay, Wingate could claim the mailing and the call did not further the scheme. Of course, that isn't what happened. Wingate instead abused his authority by deceiving his own agency, thus allowing an illegal alien to remain undetected. Thus, substantial evidence

---

**3.** "[C]ases construing the mail fraud statute [18 U.S.C. § 1341] are equally applicable to the wire fraud statute [18 U.S.C. § 1343]." *United States v. Soteras*, 770 F.2d 641, 645 n. 5 (7th Cir.1985) (citing *United States v. Feldman*, 711 F.2d 758, 763 n. 1 (7th Cir.), cert. denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983)).

**4.** The government in the alternative argues that the phone call allowed Wingate to lull Munoz, and possibly IBP, into believing that he had official authority to help Oncebay gain employment. During this time frame, Wingate was ac-

tively assisting Oncebay and Burgos. Because we find that the scheme had not been completed at the time of the mailing or the time of the phone call, we need not address whether the mailing or call had a lulling effect. But such lulling can effectively prolong a scheme that would otherwise arguably have come to fruition. Although it is not an issue here, Wingate had reason to disguise Oncebay's illegal status to divert attention from his own illegal acts on her behalf.

supports the jury's conclusion that the mailing and the telephone call were in furtherance of the scheme to defraud the government of Wingate's honest services.

**C.**

█ Wingate argues that the roughly four-month suspension, imposed by the INS after he was indicted, was a punishment. The criminal conviction therefore would be a second punishment for the same conduct, and a violation of the Double Jeopardy clause of the Fifth Amendment. Wingate seeks to apply the commensurate analysis used in *United States v. Halper*, 490 U.S. 435, 448–51, 109 S.Ct. 1892, 1901–03, 104 L.Ed.2d 487 (1989). *Halper* held that a fixed monetary sanction, which exceeds the amount making the government whole, is punishment in the constitutional sense, and triggers application of the Double Jeopardy clause. If the sanction is "overwhelmingly disproportionate" to the government's loss, *id.* at 449, 109 S.Ct. at 1902 or is "not rationally related to the goal of making the Government whole," *id.* at 451, 109 S.Ct. at 1903 the sanction is punitive in nature, and is punishment in the constitutional sense. A "civil sanction will be deemed to be punishment in the constitutional sense only if the sanction may not be fairly characterized as remedial, but only as a deterrent or retribution." *Id.* at 449, 109 S.Ct. at 1902.

The application of *Halper* to an employment context was rejected by this court in *Bae v. Shalala*, 44 F.3d 489, 494–95 (7th Cir.1995). In *Bae*, a generic drug manufacturer was convicted of a felony relating to illegal practices in the industry, and was then prohibited from working in the generic drug industry. Bae claimed that the permanent debarment violated the Double Jeopardy clause, constituting a second punishment for the same offense. We disagreed, holding that prohibition against working in the pharmaceutical field was remedial, not punitive, in nature. We reasoned that the debarment would bolster the public's health and confidence in generic drugs, would deter future misconduct, and was commensurate with the misconduct. *Id.* at 493–95

Wingate's circumstances are even less compelling than those in *Bae*—Wingate was merely suspended, not permanently barred.[5] And the government's need to restore and protect the public's confidence in law enforcement officers is arguably greater than its need to regulate the generic drug industry, because law enforcement officials are agents of the government, not private individuals in a regulated industry.

█ The sum of Wingate's argument is that the government could either suspend him or convict him, but not both. As the Eleventh Circuit has stated, "the application of the *Halper* test to this kind of sanction would work an absurd result." *United States v. Reed*, 937 F.2d 575, 578 (11th Cir. 1991). If a mere suspension triggered the Double Jeopardy clause, the government would be faced with the Hobbesian choice of either immunizing the defendant from criminal prosecution by suspending him, or allowing an indicted defendant to remain an active Special Agent, with the means and opportunity to commit more crimes. The suspension of an indicted government official is always remedial in nature, and does not implicate the Double Jeopardy clause.

**III.**

The government proved that Wingate deprived the government of his honest services by abusing his position and influence as a Special Agent in providing benefits to illegal aliens which have already or may assist Wingate with adoptions. The mailing of the Social Security card and the phone call from Munoz furthered this scheme. The admission of the stipulation was not an abuse of discretion, and in any event was harmless. Finally, the Double Jeopardy clause is not implicated by the imposition of a suspension which is remedial in character.

AFFIRMED.

---

**5.** Before trial, Wingate was terminated for reasons not explained in the record and apparently unrelated to the charged conduct.