**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**John C. HUDSON, Larry Baresel, and
Jack Butler Rackley, Defendants–
Appellants.**

Nos. 93–6117, 93–6123 and 93–6125.

United States Court of Appeals,
Tenth Circuit.

Jan. 24, 1994.

B.J. Rothbaum, Jr. of Linn & Helms, Oklahoma City, OK (Drew Neville of Linn & Helms, Oklahoma City, OK, with him on the briefs, for defendant-appellant John C. Hudson; Lynn A. Pringle and James R. Martin, Jr. of Pringle & Pringle, Oklahoma City, OK, and James A. Rolfe, Dallas, TX, on the briefs, for defendant-appellant Larry Baresel; and C. Merle Gile, Oklahoma City, OK, on the briefs, for defendant-appellant Jack Butler Rackley, for defendants-appellants.

Timothy W. Ogilvie, Asst. U.S. Atty. (John E. Green, U.S. Atty. and Barbara E. Poarch, Asst. U.S. Atty., with him, on the brief), Oklahoma City, OK, for plaintiff-appellee.

Before KELLY, SETH, and GOODWIN *, Circuit Judges.

SETH, Circuit Judge.

Appellants John Hudson, Larry Baresel and Jack Rackley were indicted in August 1992 for criminal law violations of 18 U.S.C. §§ 2, 371, 656 and 1005 because of their alleged mismanagement and illegal operation of several banks. These violations were based on the same lending transactions which were the subject of prior administrative sanctions imposed against the Appellants by the Comptroller of the Currency ("OCC") for violations of various federal banking laws.

Each Appellant moved to dismiss the indictment on double jeopardy grounds. The United States District Court for the Western District of Oklahoma consolidated and denied all three motions, and this appeal followed.

In early 1989 the OCC issued a "Notice of Assessment of a Civil Money Penalty" against the Appellants assessing civil penalties pursuant to 12 U.S.C. §§ 93(b) and 504 for alleged violations of 12 U.S.C. §§ 84 and 375b and 12 C.F.R. §§ 31.2(b) and 215.4(b). The OCC maintained that Appellants' violations caused approximately $900,000.00 in "losses". Appellant Hudson was ordered to pay $100,000.00, and Appellants Rackley and Baresel were ordered to pay $50,000.00 each. Payments were to be made to the Treasurer of the United States. Later in 1989 the OCC issued a "Notice of Intent to Prohibit Further Participation" ("Prohibition Order") to the Appellants, which sought to prevent the Appellants "from further participation, in any manner, in the conduct of the affairs of any insured depository institution." In essence, the OCC sought to prohibit Appellants from all banking activities.

As a result of the then pending OCC administrative proceedings, the Appellants entered into a Stipulation and Consent Order ("Consent Order") (October 1989) whereby Appellant Hudson consented to pay $16,-500.00 and Appellants Rackley and Baresel consented to pay $15,000.00 each. The Appellants also agreed not to participate in most, if not all, banking activities unless they received prior written authorization from the OCC and the appropriate federal regulatory agency. In addition, the Consent Order at the end included a provision ("Waiver Provision") stating:

"Respondent understands that nothing herein shall preclude any proceedings brought by the Comptroller to enforce the terms of this Stipulation and Consent, and that nothing herein constitutes, nor shall Respondent contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United nation.

* Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting by desig-

States, or agencies thereof, to bring other actions deemed appropriate."

The district court concluded that Appellants made a knowing, voluntary and intelligent waiver of their double jeopardy claim by signing the Consent Order. The district court also held, "upon review of the record", that the agreed upon fines and nonparticipation sanctions were "solely" remedial. Thus the conclusion that Appellants' double jeopardy claims must fail. By basing its decision on the foregoing, the court stated that it did not consider whether the "conduct" underlying the OCC sanctions and the indictment was the same.

The first issue to be considered is whether the Waiver Provision of the Consent Order effectively cut off Appellants' rights to raise the double jeopardy defense. We review the decision of the district court on this issue *de novo*. *Larson v. Tansy*, 911 F.2d 392 (10th Cir.). To be valid waivers "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747. Moreover, because a fundamental constitutional right is at issue, we must subject the purported waiver to stringent scrutiny and "indulge every reasonable presumption against the loss of constitutional rights." *United States v. Geittmann*, 733 F.2d 1419, 1423 (10th Cir.) (quoting *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353).

The pertinent language of the Waiver Provision provides that "nothing herein constitutes, nor shall Respondent contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United States ... to bring other actions...." This language states that the Government does not waive its rights to institute further actions against Appellants. In fact, the Government did precisely this by filing the indictment. Contrary to the Government's position, however, the provision's language cannot reasonably be interpreted as a waiver by Appellants of their constitutional rights to raise valid defenses to the indictment. If it was the Government's intent to

have Appellants waive certain rights, the Government would have phrased the Waiver Provision in terms which clearly stated that Appellants were abandoning those rights so that they could have made a voluntary, intelligent and knowing waiver. We note in passing that Article III of the Consent Order explicitly enumerated various rights and interests that were expressly waived by Appellants and that this would have been the appropriate place to create a waiver of Appellants' double jeopardy rights.

The Government would have us rely on *United States v. Marcus Schloss & Co.*, 724 F.Supp. 1123 (S.D.N.Y.), in which the court held:

> "[T]he defendant in an SEC civil proceeding who, *with knowledge of a pending criminal inquiry*, enters into a consent order explicitly recognizing the absence of any bar to criminal proceedings arising out of the same conduct, cannot subsequently advance that civil disposition, even accompanied by monetary sanctions, as the basis for a claim of double jeopardy."

*Id.* at 1127 (emphasis added). The problem with the Government's reliance on *Marcus Schloss* is that there is no evidence in the record before us that Appellants had knowledge of any pending criminal proceedings or inquiries. Based on the record, we hold that the Waiver Provision's protection of the Government's right and authority to bring further actions does not operate as a valid waiver by Appellants of the double jeopardy defense. The most that can be said in view of the introductory words "Respondents understand" is that they could be sued.

The remaining issue on appeal is whether the district court correctly held that Appellants were not entitled to double jeopardy protection because both the nonparticipation and the money sanctions were not punishment. The standard of review of this issue is also *de novo*. *United States v. Sasser*, 974 F.2d 1544, 1549 (10th Cir.).

In addressing the parties' arguments relating to the punitive nature of the civil sanctions imposed, the district court correctly relied on the Supreme Court's decision in *United States v. Halper*, 490 U.S. 435, 109

S.Ct. 1892, 104 L.Ed.2d 487. As in *Halper,* we are concerned with the Double Jeopardy Clause's protection against multiple punishments for the same offense. Because it is indisputable that the pending criminal indictment seeks to punish the Appellants, we must determine whether the sanctions imposed pursuant to the Consent Order were "punishment" for purposes of double jeopardy analysis. The Court in *Halper* stated:

> "that in determining whether a particular civil sanction constitutes criminal punishment, it is the purposes actually served by the sanction in question, not the underlying nature of the proceeding giving rise to the sanction, that must be evaluated."

*Halper,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7.

> "To that end, the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. . . .
>
> ". . . We have recognized in other contexts that punishment serves the twin aims of retribution and deterrence. . . . [I]t follows that a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term. . . . We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution."

*Id.* at 448–49, 109 S.Ct. at 1902 (citations omitted).

■ Appellants contend that the above quoted language means that unless a sanction is "solely" remedial, i.e., not serving deterrent or retributive ends, it is punishment. This position is confirmed by the recent Supreme Court decision in *Austin v. United States,* — U.S. —, 113 S.Ct. 2801, 125 L.Ed.2d 488.

In *Austin,* the Court addressed whether a civil forfeiture was punishment for purposes of the Eighth Amendment's Excessive Fines Clause. The Court noted that "sanctions frequently serve more than one purpose." *Id.* at —, 113 S.Ct. at 2802. However, even if a sanction is remedial, it is still subject to the Excessive Fines Clause if "it can only be explained as serving *in part* to punish." *Id.* (emphasis added). The Court went on to quote the *Halper* decision in support of its holding that the forfeiture was punishment because it did not serve "solely" remedial purposes. *Id.* at —, 113 S.Ct. at 4816.

■ Furthermore, Appellants' proposition that a sanction should be considered punishment if it is not solely remedial is supported by common sense. That is to say, if a particular remedial sanction can only be understood as also serving punitive goals, then the person subjected to the sanction has been punished despite that fact that the sanction is also remedial. To conclude otherwise effectively invalidates the Double Jeopardy Clause by allowing multiple punishments for the same conduct merely because the punishments also serve remedial purposes. We therefore must conclude that if a sanction is not exclusively remedial, but rather can only be explained as also affecting deterrence or retribution, it is punishment for double jeopardy analysis. We are careful to note that a determination that a sanction is at least in part punishment requires that it *must* be explained as also serving as a deterrent or retribution, not merely that it *may* be so explained.

Although *Halper* dealt with the scenario where civil sanctions were meted out after a criminal prosecution, we have recognized that a civil sanction's being exacted first does not alter the applicability of *Halper. United States v. Bizzell,* 921 F.2d 263 (10th Cir.).

### The Nonparticipation Sanctions

The nonparticipation sanctions were agreed to by Appellants when they signed the Consent Order. The gist of these sanctions, which were premised on 12 U.S.C. § 1818(e), (i), was that Appellants were indefinitely barred from any further banking

activities until such time as they obtained the written consent of the OCC and other appropriate regulatory agencies to reenter the banking industry. The parties are primarily concerned with § 1818(e) which provides:

(1) Authority to issue order. Whenever the appropriate Federal banking agency determines that—

(A) any institution-affiliated party has, directly or indirectly—

(i) violated—

(I) any law or regulation;

. . . .

(ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

(iii) committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty;

(B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

(i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

(ii) the interests of the insured depository institution's depositors have been or could be prejudiced; or

(iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

(C) such violation, practice, or breach—

(i) involves personal dishonesty on the part of such party; or

(ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the agency may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

■ Although the Supreme Court has expressly refused to rely on statutory language as determinative of the remedial or punitive qualities of a sanction, *Halper*, 490 U.S. at 447, 109 S.Ct. at 1902 ("the labels 'criminal' and 'civil' are not of paramount importance"), "the Court did not abandon earlier analytical framework used to determine whether a specific penalty provision may be characterized as remedial or punitive in a general sense." *United States v. WRW Corp.*, 986 F.2d 138, 140 (6th Cir.). With this in mind, Appellants argue that the express language of § 1818(e) coupled with its legislative history clearly demonstrate that the statute was intended to serve punitive goals. However, Appellants concede that § 1818(e) is also designed in part to protect the integrity of the banking system which promotes a remedial goal. While we agree that § 1818(e) may serve to punish individuals for, *inter alia*, violations of any law, it does not follow that all sanctions are necessarily presumed to be punitive when the express language, as conceded by Appellants, also allows for remedial sanctions.

We have previously addressed a similar sanction in *United States v. Bizzell*, 921 F.2d 263 (10th Cir.). In that case, the two defendants were charged by the Department of Housing and Urban Development ("HUD") with filing false statements and violating various HUD regulations. Ultimately, the defendant John Bizzell entered into a settlement agreement whereby he agreed to a two-year exclusion from HUD activities conditioned upon a payment of thirty thousand dollars. *Id.* at 265. Defendant Charles Bizzell signed a similar agreement not to participate for eighteen months. *Id.* Subsequently, defendants were indicted on numerous criminal violations related to their HUD activities. On appeal from the district court's denial of their motion for summary judgment based on double jeopardy, we held that the "penalty of debarment is strictly remedial. . . . It is the clear intent of debarment to purge government programs of corrupt influences and to prevent improper dissipation of public funds. Removal of persons whose participation in those programs is detrimental to public purposes is remedial by definition." *Id.* at 267.

■ Similarly, the OCC's use of debarment as a means of protecting the integrity

of the banking system and the interests of the depositors is a legitimate remedial purpose that need not necessarily be defined as also serving as deterrence or retribution. Appellants attempt to distinguish *Bizzell* by arguing that they are barred for life as opposed to eighteen or twenty-four months. This distinction is unpersuasive because the Prohibition Order clearly states that they may again participate in banking activities if they obtain the proper consent.

Moreover, Appellants claim that the OCC's prohibition is punitive because there was a finding of scienter, i.e., that Appellants had violated a law or regulation through personal dishonesty. Again this fails because the finding by the OCC was that Appellants had "engaged in conduct or practice ... which resulted in substantial financial loss or other damage...." Prohibition Order, p. 1. The fact that Appellants' violations involved personal dishonesty is not dispositive. *See Bizzell*, 921 F.2d at 265 (defendants' sanctions based on filing false statements). While Appellants "may interpret debarment as punitive, and indeed feel as though they have been punished, debarment constitutes the 'rough remedial justice' permissible as a prophylactic governmental action." *Id.* at 267 (citation omitted).

Having reviewed the evidence surrounding Appellants' alleged misconduct and the subsequent Consent Order, we are convinced that the Government's nonparticipation sanction was solely designed to protect the integrity of the banking industry by purging the system of corrupt influences. We therefore hold that Appellants' revokable ban from further participation in banking activities is solely remedial even though it carries the sting of punishment in the eyes of Appellants.

### The Money Sanctions

The prohibition sanctions were remedial, but what of the money sanctions? *Halper,* *Bizzell* and *WRW* addressed the situation where the sanctions allegedly exceeded the actual damage caused by the various defendants. In the case presented herein, Appellants allegedly caused over $900,000.00 in losses, yet were originally fined $200,000.00,

which was later reduced substantially by the Consent Order. From this the district court concluded:

"It is not disputed by the defendants that 12 U.S.C. §§ 93 ... [and 504] give the Comptroller authority to assess civil money penalties for violations.... As noted by the government:

"The amounts of money that may be assessed [under the statutes] is stated in terms of the number of days that each violation continues. In addition, both statutes require the OCC to take into account the financial resources and good faith of the person against whom sanctions are sought, the gravity of the violation, the history of previous violations, and any other factors that justice may require, in determining the appropriate sanction to impose.

"The amounts of the agreed fines appear to be reasonable under the guidelines set forth in the statutes, and the statutes serve legitimate remedial goals."

Order, pgs. 5–6 (filed March 25, 1993) (citation omitted).

Our problem with this holding is that the district court determined only that "the statutes" are remedial. As we have stated, the fact that a statute may be remedial does not necessarily mean that sanctions imposed thereunder are solely remedial. We are also troubled by the absence of any declaration of what the precise remedial goals of the statutes are. Moreover, we disagree with the trial court's implied conclusion that the statutes are exclusively remedial because they authorize civil remedies which take into account various factors like history of violations, a party's financial resources and good faith, and the gravity of the violation. These factors are equally consistent with a deterrence determination. Thus the Government may employ these factors in order to exact an appropriate money sanction that will effectively deter a party from further wrongdoing.

Additionally, we recognize that the language of 12 U.S.C. § 504 closely parallels that of 12 U.S.C. § 93(b), and that both expressly permit civil sanctions. However,

these sanctions are "money penalties" limited to a maximum of $1,000.00 per day of a continuing violation. Rather than remedying any particular loss, these statutes appear to be designed, at least in part, to punish and deter improper conduct. This is further exemplified by § 93(a) which provides that parties are personally liable for all damages caused by any knowing violations. On its face, this provision seems to remedy injured parties for losses incurred by the same conduct that is subjected to penalties pursuant to §§ 93(b) and 504.

 We also conclude that the court's determination that the amounts of the fines were reasonable was without any factual support in the record. The court made no findings as to the actual losses incurred nor who may have suffered the losses, and how they compared to the sanctions imposed. In addition, even if they were reasonable, the sanctions could still be punitive. Merely because overly excessive fines may be deemed punitive, *see Halper*, 490 U.S. at 452, 109 S.Ct. at 1904, the converse is not necessarily true, i.e., a money sanction can be reasonably related to one's violations and still be used as punishment. We must therefore vacate the district court's holding concerning the money sanctions and remand for further proceedings.

In deciding whether or not the fines are solely remedial, the court must determine the precise injury caused to the Government for which the sanctions are the remedy. *See Halper*, 490 U.S. at 452, 109 S.Ct. at 1904 (on remand Government must provide accounting of actual losses). *See also* 12 U.S.C. §§ 93(b)(8) and 504(g) (monies are to be paid to the United States Treasury). If there was no injury to be remedied, then presumably the fines were imposed to deter the Appellants from continued violations. If there was an injury, the court must determine if the fines were in fact intended solely to remedy the injury, which will include a determination whether they were reasonable. The "same conduct" issue may have to be decided. *See Burke v. Board,* 940 F.2d 1360 (10th Cir.), wherein the court decided that the two did not relate to the same offense.

Accordingly, the district court's holding on the waiver issue is REVERSED; its holding on the nonparticipation sanction issue is AFFIRMED; its decision on the money sanction issue is VACATED; and the case is REMANDED for further proceedings consistent with this opinion. IT IS SO ORDERED.