UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-2175

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT S. STOLLER,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge] 



Before

Selya, Circuit Judge, 

Aldrich and Coffin, Senior Circuit Judges. 



John A. MacFadyen, with whom Richard M. Egbert was on brief, 
for appellant.
Anita S. Lichtblau, Trial Attorney, United States Dep't of 
Justice, with whom Donald K. Stern, United States Attorney, and 
Mark D. Seltzer, Director, New England Bank Fraud Task Force, 
were on brief, for the United States.



February 29, 1996


SELYA, Circuit Judge. This appeal requires us to SELYA, Circuit Judge. 

explore a shadowy corner of the Double Jeopardy Clause, dimly lit

by a trilogy of recent Supreme Court cases. Concluding, as we

do, that an administrative sanction imposed by the Federal

Deposit Insurance Corporation (FDIC) does not comprise

"punishment" within the purview of the Clause, we uphold the

district court's denial of a motion to dismiss criminal charges

later lodged against the same individual.

I. BACKGROUND I. BACKGROUND

Following chronological order, we recount the details

of the administrative proceeding and then discuss the criminal

case.

A. The Administrative Proceeding. A. The Administrative Proceeding. 

From 1975 to 1990, defendant-appellant Robert S.

Stoller toiled as the chief executive officer of the Coolidge

Corner Cooperative Bank (the Bank). In 1986, the Bank became

federally insured. Thereafter, Stoller caused it to make loans

to several real estate trusts with which he was affiliated. The

loans soured and the Bank sustained heavy losses.

In 1990, the FDIC instituted a debarment proceeding

against Stoller. The FDIC charged, and an administrative law

judge (ALJ) found, that the Bank underwrote the suspect loans

without appropriate disclosure and in violation of Regulation O,

12 C.F.R. 215 (a rule that caps the amount of credit a

federally insured institution may extend to insiders and imposes

lending limits on other extensions of credit). The ALJ concluded

2

that Stoller's transgressions demonstrated a willful and

persistent disregard for the Bank's soundness, and therefore

warranted an order of proscription under 12 U.S.C. 1818(e).1

On administrative review, the FDIC's board of directors (the

Board) affirmed the ALJ's factual determinations and approved his

recommended order. Stoller requested reconsideration and

clarification. On September 22, 1992, the Board issued a revised

decision upholding the debarment order in slightly altered form:

in its final version, the order prevents Stoller (who is an

attorney) from serving as an officer or director of, exercising

control over, or acting as counsel to, any federally insured

financial institution.

B. The Criminal Case. B. The Criminal Case. 

In January 1995, a federal grand jury indicted Stoller

for divers violations of federal banking laws, including nine

counts of misapplying bank funds, see 18 U.S.C. 656; thirty-one 

counts of unlawfully receiving loan-procurement commissions, see 

id. 215; and eight counts of making false entries, see id.  

1005. Stoller promptly moved to dismiss the first nine counts of

the indictment on double jeopardy grounds. The district court

denied the motion, concluding that the debarment order did not

constitute punishment in the relevant constitutional sense. See 

United States v. Stoller, 906 F. Supp. 39 (D. Mass. 1995). This 

appeal followed.

 

1This statute and the criminal statutes underpinning the
later indictment are reprinted in the appendix.

3

II. APPELLATE JURISDICTION II. APPELLATE JURISDICTION

As a general rule, federal appellate courts have

jurisdiction only over final orders and judgments of district

courts, and not over interlocutory decisions. See 28 U.S.C.  

1291. In Abney v. United States, 431 U.S. 651 (1977), the 

Supreme Court carved an exception to this rule for pretrial

refusals to dismiss criminal charges on double jeopardy grounds.

Emphasizing that the Double Jeopardy Clause is a "guarantee

against being twice put to trial for the same offense," id. at 

661, the Court held that "pretrial orders rejecting claims of

former jeopardy . . . constitute `final decisions' and thus

satisfy the jurisdictional prerequisites of 1291," id. at 662. 

It is possible to read too much into Abney. The Double 

Jeopardy Clause states that no person "shall . . . be subject for

the same offence to be twice put in jeopardy of life or limb."

U.S. Const. amend. V. This protection is threefold: "it

safeguards an individual against (1) a second prosecution for the

same offense, following an acquittal; (2) a second prosecution

for the same offense, following a conviction; and (3) multiple

punishments for the same offense." United States v. Rivera- 

Martinez, 931 F.2d 148, 152 (1st Cir.), cert. denied, 502 U.S. 

862 (1991). Abney spoke to a situation involving multiple 

prosecutions. Cases that involve multiple punishments arguably

raise different jurisdictional concerns for appellate courts.

In United States v. Ramirez-Burgos, 44 F.3d 17 (1st 

Cir. 1995), this court dismissed an interlocutory appeal stemming

4

from the rejection of a multiple punishments claim asserted in

connection with parallel counts contained in a single indictment.

See id. at 18. We ruled that the defendant's right not to be 

punished twice could be vindicated adequately through a

subsequent, end-of-case appeal, and distinguished those

interlocutory double jeopardy appeals (like Abney) that demand 

final resolution prior to trial because the defendant advances a

claim alleging impermissible multiple prosecutions. See id. at 

18-19.

Stoller's case falls somewhere between Abney and 

Ramirez-Burgos. Unlike in Abney, his double jeopardy claim rests 

on the prospect of multiple punishments rather than the fear of

multiple prosecutions. Unlike in Ramirez-Burgos, however, the 

alleged multiple punishments arise in the course of two separate

and successive proceedings rather than within a single

proceeding. To complicate matters further, the fate of Ramirez- 

Burgos is uncertain in light of the Supreme Court's recent 

decision in Witte v. United States, 115 S. Ct. 2199 (1995).2 
 

2In Witte, the defendant moved to dismiss an indictment on 
the ground that the conduct underlying it had already been taken
into account when he was sentenced on a previous charge. The
defendant argued that the prosecution of the new charge subjected
him to multiple punishments for the same offense in violation of
the double jeopardy guarantee. See Witte, 115 S. Ct. at 2204-05. 
He convinced the district court but the court of appeals
reversed. 25 F.3d 250, 252 (5th Cir. 1994). On certiorari, the
Supreme Court declared the claim to be "ripe at this stage of the
prosecution although petitioner has not yet been convicted of
the [second charge] because, as we have said, `courts may not
impose more than one punishment for the same offense and
prosecutors ordinarily may not attempt to secure that punishment
in more than one trial.'" 115 S. Ct. at 2205 (quoting Brown v. 
Ohio, 432 U.S. 161, 165 (1977)). 

5

Although Witte and Ramirez-Burgos can perhaps be reconciled, the 

most obvious basis for harmonizing them the number of

proceedings involved would, if accepted, remove this appeal

from the reach of Ramirez-Burgos. Moreover, at least one circuit 

has observed that, under Witte, all double jeopardy appeals that 

raise nonfrivolous multiple punishments arguments must now be

considered ripe for immediate review. See United States v. 

Baird, 63 F.3d 1213, 1215 & n.4 (3d Cir. 1995), cert. denied,  

S. Ct. (1996).

We elect to detour around this Serbonian bog. It is a

familiar tenet that when an appeal presents a jurisdictional

quandary, yet the merits of the underlying issue, if reached,

will in any event be resolved in favor of the party challenging

the court's jurisdiction, then the court may forsake the

jurisdictional riddle and simply dispose of the appeal on the

merits. See Norton v. Mathews, 427 U.S. 524, 530-31 (1976); 

Secretary of the Navy v. Avrech, 418 U.S. 676, 677-78 (1974) (per 

curiam); United States v. Saccoccia, 58 F.3d 754, 767 n.6 (1st 

Cir. 1995); United States v. Connell, 6 F.3d 27, 29 n.3 (1st Cir. 

1993). We follow that course, leaving for another day the

questions surrounding the continued vitality of Ramirez-Burgos. 

III. THE DOUBLE JEOPARDY CLAIM III. THE DOUBLE JEOPARDY CLAIM

We confine our discussion to the branch of the Double

Jeopardy Clause that embodies the constitutional protection

6

against multiple punishments.3 Though our analysis proceeds in

three segments, we pause at the brink to acknowledge a few well-

established principles.

First, though former jeopardy is a criminal law

concept, it is by now settled that, if other conditions are met,

either criminal prosecutions or civil proceedings instituted by

the same sovereign may result in punishment sufficient to

implicate the Double Jeopardy Clause. See United States v. 

Halper, 490 U.S. 435, 443 (1989). Second, not all civil 

sanctions constitute cognizable punishment. To separate wheat

from chaff, an inquiring court must scrutinize a civil sanction

objectively rather than subjectively for, from the defendant's

standpoint, "even remedial sanctions carry the sting of

punishment." Id. at 447 n.7. Third, as long as a civil sanction 

constitutes punishment in the relevant sense, it does not matter

if the "multiple" punishment presumably a criminal sentence 

precedes the attempt to impose the sanction, or conversely, if

the sanction precedes the attempt to convict the defendant.

Notwithstanding the difference in sequence, the Double Jeopardy

Clause reaches both situations. See United States v. Hudson, 14 

F.3d 536, 540 (10th Cir. 1994); United States v. Reed, 937 F.2d 

575, 577 n.3 (11th Cir. 1991).

 

3On appeal, Stoller makes a feeble effort to reformulate his
double jeopardy challenge to encompass the notion of successive
prosecutions. Since he did not raise this theory below, we will
not waste time on it now. See United States v. Slade, 980 F.2d 
27, 30 (1st Cir. 1992). In all events, the belated contention
adds nothing of consequence to Stoller's asseverational array.

7

These principles help courts to solve the routine

questions that are posed when civil sanctions are alleged to run

afoul of the Double Jeopardy Clause. Nevertheless, when a court

confronts the task of determining the status of a particular

civil penalty under double jeopardy analysis, extremely

sophisticated questions can sometimes arise. The answers to

those questions may depend on the trilogy of Supreme Court cases

to which we now repair.

A. The Trilogy. A. The Trilogy. 

The seminal case is Halper. There the government 

successfully prosecuted criminal charges against a physician who,

it asserted, had defrauded the federal Medicare program on sixty-

five separate occasions. The judge imposed a prison sentence and

a fine. See Halper, 490 U.S. at 437. Thereafter, the government 

brought a civil suit against Dr. Halper under the False Claims

Act, 31 U.S.C. 3729-3730, seeking to recover damages plus a

penalty equal to $2,000 per violation. The district judge, after

contrasting the extent of the government's claim for these items

($131,170) with the provable amount of the loss occasioned by Dr.

Halper's defalcations ($585), awarded the government $16,000.

The judge reasoned that a more munificent award would be so

disproportionate as to constitute punishment and would therefore

raise double jeopardy questions. See Halper, 490 U.S. at 438-39. 

The Supreme Court ultimately accepted this reasoning,4 finding
 

4The Court did not affirm, but instead vacated the award and
remanded for a more precise determination of the government's
actual loses. See Halper, 490 U.S. at 452. 

8

double jeopardy to be a matter of concern "where a fixed-penalty

provision subjects a[n] . . . offender to a sanction

overwhelmingly disproportionate to the damages he has caused."

Id. at 449. 

The Halper Court offered some insights into when 

particular civil penalties might be regarded as punishments in

the relevant sense. Making such a determination "requires a

particularized assessment of the penalty imposed and the purposes

the penalty may fairly be said to serve. Simply put, a civil as

well as a criminal sanction constitutes punishment when the

sanction as applied in the individual case serves the goals of

punishment." Id. at 448. Withal, Halper did not brand every 

monetary penalty exceeding actual financial loss as punitive per

se. To the contrary, the Court stated that "the Government is

entitled to rough remedial justice, that is, it may demand

compensation according to somewhat imprecise formulas, such as

reasonable liquidated damages or a fixed sum plus double damages,

without being deemed to have imposed a second punishment for the

purpose of double jeopardy analysis." Id. at 446. It is only 

when the recovery is "not rationally related to the goal of

making the Government whole" that the prospect of multiple

punishment looms. Id. at 451. It is in this context that the 

Halper dichotomy surfaced: Justice Blackmun wrote that "a civil 

sanction that cannot fairly be said solely to serve a remedial

purpose, but rather can only be explained as also serving either

retributive or deterrent purposes, is punishment, as we have come

9

to understand the term." Id. at 448. 

In Austin v. United States, 113 S. Ct. 2801 (1993), the 

Court mulled a constitutional challenge to the civil forfeiture

of property (Austin's home and business) used to facilitate

narcotics transactions. After deciding that the Excessive Fines

Clause, U.S. Const. amend. VIII, reached punitive sanctions

levied in nominally civil proceedings, see id. at 2805-06, 

Justice Blackmun invoked his own invention the Halper dichotomy 

as an aid in determining how a particular sanction might be

characterized. Responding to concerns articulated by Justices

Scalia and Kennedy (each of whom concurred in the judgment but

wrote separately), Justice Blackmun suggested that under Halper 

"the question is whether forfeiture serves in part to punish, and 

one need not exclude the possibility that forfeiture serves other

purposes to reach that conclusion." Id. at 2810 n.12 (emphasis 

in original). While Justice Blackmun acknowledged that "the

forfeiture of contraband itself may be characterized as remedial

because it removes dangerous or illegal items from society," he

declined to extend that reasoning to the sovereign's confiscation

of a defendant's home and business (even though drug trafficking

may have occurred there). Id. at 2811. Moreover, "the dramatic 

variations in the value of . . . property forfeitable" under the

applicable civil forfeiture statutes undermined any serious claim

that such forfeitures merely provided appropriate compensation

for the government's losses. Id. at 2812. In other words, 

forfeitures of random magnitude were punitive in nature mainly

10

because of sheer vagariousness.5

The capstone of the trilogy is Department of Revenue v. 

Kurth Ranch, 114 S. Ct. 1937 (1994). There the Supreme Court 

revisited its double jeopardy jurisprudence and found that a

Montana tax on the possession of illegal drugs constituted a

punishment. See id. at 1948. Justice Stevens, writing for the 

majority, abjured the Halper dichotomy. He explained this shift 

of focus on the basis that "Halper's method of determining 

whether the exaction was remedial or punitive simply does not

work in the case of a tax statute." Id. (citation and internal 

quotation marks omitted).6

In lieu of the inelastic Halper dichotomy the Kurth 

Ranch Court advocated a more flexible approach and undertook to 

evaluate the defendant's double jeopardy claim through an

examination of the aggregate circumstances surrounding the

imposition of the tax. See id. at 1946-48. Marshaling the 

pertinent facts, the Court remarked the tax's high rate, obvious

deterrent purpose, and linkage with the taxpayer's commission of

a drug-related crime, see id. at 1946-47, and took particular 
 

5Austin is likely not the last word on civil forfeitures in 
these purlieus. The Court has taken certiorari in two forfeiture
cases that feature double jeopardy challenges. See United States 
v. Ursery, 59 F.3d 568 (6th Cir. 1995), cert. granted, 116 S. Ct. 
762 (1996); United States v. $405,089.23, 56 F.3d 41 (9th Cir. 
1995), cert. granted, 116 S. Ct. 762 (1996). 

6Elaborating on this theme, Chief Justice Rehnquist (with
whom the majority agreed on this point) explained that "the
purpose of a tax statute is not to recover the costs incurred by
the government for bringing someone to book for some violation of
law, but is instead to either raise revenue, deter conduct, or
both." Id. at 1949 (Rehnquist, C.J., dissenting). 

11

note of the fact that the property to be taxed was no longer in

the taxpayer's possession, see id. at 1948. Accordingly, the 

Court judged the tax to be punitive and held that its assessment

after the taxpayer had been convicted and sentenced for the

underlying narcotics offense would constitute double jeopardy.

See id. 

B. The Analytic Framework. B. The Analytic Framework. 

The threshold question is whether the Halper dichotomy 

furnishes the beacon by which we must steer in evaluating

Stoller's double jeopardy claim. We hold that the dichotomy 

the Halper Court's litmus test for determining the nature of a 

civil sanction is limited to cases involving fines,

forfeitures, and other monetary penalties designed to make the

sovereign whole for harm or loss that is quantifiable in actual

or approximate monetary terms. In other cases, the preferred

method of analysis is the totality-of-the-circumstances test

employed in Kurth Ranch. Thus, the Halper dichotomy is 

inapposite in the typical debarment case (as here).

1. In Kurth Ranch, 114 S. Ct. at 1948, the Court 1. 

recognized the limitations of the dichotomy conceived in Halper 

and nourished in Austin. The Halper dichotomy is serviceable in 

the context of a fine, forfeiture, or other monetary penalty that

is itself quantifiable in dollars and is intended to correspond

with a quantifiable loss. In such situations, a simple

mathematical computation reveals with some degree of precision

12

whether the penalty is in proportion to the misconduct.7 This

comparison, in turn, determines the nature of the sanction: the

sanction is either restitutionary in an approximate sense (and,

hence, remedial) or it is not (and, hence, punitive). This is a

practical, easily administered rule of thumb but it operates

satisfactorily only because the extent to which a monetary

exaction exceeds actual loss is quantifiable. Where that is so 

as in Halper the test works; but in other kinds of cases as 

in Kurth Ranch and here the dichotomy is dysfunctional.8 

We think that Halper itself recognized these 

limitations. The holding of the Halper Court a holding that 

appeared in the very next sentence following the sentence that

framed the dichotomy is "that under the Double Jeopardy Clause

a defendant who already has been punished in a criminal

prosecution may not be subjected to an additional civil sanction

to the extent that the second sanction may not fairly be

characterized as remedial, but only as a deterrent or

retribution." 490 U.S. at 448-49. A significantly

 

7Even in such cases, the dichotomy has a troubling aspect.
See Austin, 113 S. Ct. at 2813 n.* (Scalia, J., concurring) 
(questioning the language used by Justice Blackmun because
virtually by definition a "statutory forfeiture must always be at 
least `partly punitive'") (emphasis in original).

8While Kurth Ranch dealt with a quantifiable monetary 
penalty a tax it did not involve the satisfaction of a
quantifiable loss. Tax statutes are not usually predicated on a
calculation of damages or costs sustained by the sovereign
through the taxpayer's acts, and the tax statute at issue in
Kurth Ranch (which imposed a tax of the greater of $100 per ounce 
of marijuana or ten percent of its market value, see 114 S. Ct. 
at 1941) is no exception.

13

disproportionate monetary sanction cannot fairly be characterized

as remedial and, thus, must be regarded as being in service to

punitive ends (deterrence or retribution). Non-monetary

sanctions elude such facile classification. Indeed, many non-

monetary sanctions are hybrids; while not solely in service to

remedial goals, they cannot fairly be characterized as serving

only punitive purposes. We believe it is for this reason that

the Halper Court, knowing many civil sanctions would not fit the 

analytic mold it had cast for use in connection with certain

types of monetary penalties, stressed the circumscribed nature of

its holding and styled its dichotomous approach as "a rule for

the rare case." Id. at 449. 

We are unwilling to accept Stoller's contention that

Austin signals a widening of Halper's purposefully narrow 

holding. In Austin, the applicable statute purportedly entitled 

the government to recover property used to facilitate drug

transactions regardless of the property's value in relation to

the amount of drugs purveyed or the losses to the government

occasioned thereby. See Austin, 113 S. Ct. at 2812. The 

defendant's challenge to the forfeiture pivoted on the Excessive

Fines Clause, not the Double Jeopardy Clause. See id. at 2812 

n.14. Although the Court often interchanges precedents under

these clauses, Austin is a case in which the source of the 

challenge possessed decretory significance. In assessing

multiple punishment claims under double jeopardy analysis, the

answer to the dispositive question ultimately depends on whether

14

a sanction is "punitive." By contrast, in pondering a claim

under the Excessive Fines Clause, the answer to the dispositive

question ultimately depends on whether a sanction is "excessive."

See id. To arrive at a judgment on excessiveness, a reviewing 

court must necessarily determine if the fine is in proportion to

the harm inflicted and/or the loss sustained and it must apply

that criterion regardless of whether the harm or loss is

quantifiable. See Alexander v. United States, 113 S. Ct. 2766, 

2776 (1993). It follows that, in double jeopardy cases involving

non-monetary sanctions, we can read very little into the Austin 

Court's commentary.

2. Moving beyond the trilogy, the weight of appellate 2.

authority buttresses our binary conclusion that in double

jeopardy cases (a) the Halper method of analysis is the exception 

while the Kurth Ranch method is the general rule, and (b) 

strictly speaking, the Halper dichotomy does not apply to non- 

monetary sanctions. See, e.g., United States v. Hernandez- 

Fundora, 58 F.3d 802, 806 (2d Cir.) (refusing to extend the 

Halper dichotomy to a prisoner's claim that his conviction and 

sentence on charges of assault, after correctional authorities

had meted out disciplinary segregation for the same offense,

violated the multiple punishments branch of the Double Jeopardy

Clause), cert. denied, 115 S. Ct. 2288 (1995). While the Supreme 

Court has not yet decided a case raising a double jeopardy

challenge to a criminal prosecution that stalks behind the

issuance of a debarment order, several courts of appeals have

15

considered and rejected such challenges in the reflection of

Halper. 

In Reed, 937 F.2d at 577, the Eleventh Circuit declined 

to apply the Halper dichotomy to an employment proscription. 

Reed involved a double jeopardy challenge to an indictment for 

misappropriation of postal funds that followed a thirty-day

disciplinary suspension imposed by an arbitrator for the same

conduct. The court labelled the Halper dichotomy "inapposite" in 

cases involving non-monetary sanctions. Id. at 578. But the 

court's rejection of the dichotomy was by no means a rejection of

Halper itself. The court found guidance as do we in the 

general principles discussed by the Halper Court, and, 

adumbrating the methodology that the Supreme Court later adopted

in Kurth Ranch, the Reed panel examined the overall circumstances 

in order to determine whether the proscriptive sanction should be

characterized as punitive or remedial. See id. 

The same court also declined to apply Halper in a case 

that bears a distinct family resemblance to the case at bar. In

Manocchio v. Kusserow, 961 F.2d 1539 (11th Cir. 1992), the court 

found no double jeopardy barrier to an administrative order

excluding a physician from participating in the federal Medicare

program for at least five years, notwithstanding that the order

followed the doctor's conviction and sentencing on criminal

charges of Medicare fraud. Dismissing the physician's lament

that the debarment order, from his perspective, was unarguably

punitive, the court determined the sanction to be remedial. See 

16

id. at 1542 (stating, inter alia, that "the purpose of . . . 

exclusion is to protect the public, a legitimate nonpunitive

goal"). Because the agency "did not assess monetary damages,"

the court ruled that "Halper's analysis . . . does not apply." 

Id. Instead, it focused on the totality of the circumstances. 

See id. 

To be sure, these decisions predate Austin but 

because debarment does not come within the Excessive Fines Clause

as we understand it, see Browning-Ferris Indus. v. Kelco 

Disposal, Inc., 492 U.S. 257, 264-65 (1989) (holding that the 

Excessive Fines Clause is implicated only when a party must make

"a payment to a sovereign as punishment for some offense"),9

nothing in Austin diminishes their vitality. More to the point, 

Kurth Ranch, a post-Austin case, makes it pellucid that, when 

there is no occasion for an inquiry into financial

proportionality, the classic Halper framework does not fit. See 

Kurth Ranch, 114 S. Ct. at 1948. 

Two other courts of appeals have arrived at the same

destination by a more roundabout route. In Hudson, 14 F.3d 536, 

the Tenth Circuit faced a scenario on all fours with the scenario

presented here. Acting under the identical statute that the FDIC

employed vis-a-vis Stoller, 12 U.S.C. 1818(e), the Comptroller

of the Currency initiated administrative proceedings against

several individuals. He succeeded in securing debarment orders
 

9Stoller has not argued that the Excessive Fines Clause
applies in this case; and, insofar as we can tell, no such
argument was advanced in either Reed or Manocchio. 

17

and agreements for partial restitution. See Hudson, 14 F.3d at 

538. The government later pressed criminal charges based on the

same course of conduct. See id. In analyzing the ensuing double 

jeopardy challenge, the Tenth Circuit, echoing Halper, stated 

"that a sanction should be considered punishment if it is not

solely remedial," but placed a gloss on this statement,

explaining "that a determination that a sanction is at least in

part punishment requires that it must be explained as also 

serving as a deterrent or retribution, not merely that it may be 

so explained." Id. at 540 (emphasis in original). The court 

then pointed out that while 1818(e) may serve to punish

lawbreakers, "it does not follow that all sanctions are

necessarily presumed to be punitive when the [statute's] express

language . . . also allows for remedial sanctions." Id. at 541. 

Applying these tenets, the court concluded that the debarment

orders did not comprise punishments and, therefore, rebuffed the

claim of former jeopardy. See id. at 542. 

In Bae v. Shalala, 44 F.3d 489 (7th Cir. 1995), the 

Seventh Circuit used a similar mode of analysis in turning aside

an ex post facto challenge to a debarment order. The court

assumed the primacy of Halper and started from the premise that, 

unless a civil sanction can "fairly be said solely to serve a

remedial purpose," it constitutes punishment. Id. at 493 

(quoting Halper, 490 U.S. at 448). But the court added: 

A civil sanction that can fairly be said
solely to serve remedial goals will not fail
under ex post facto scrutiny simply because 
it is consistent with punitive goals as well.

18

A civil sanction will be deemed to be
punishment in the constitutional sense only
if the sanction "may not fairly be
characterized as remedial, but only as a 
deterrent or retribution."

Id. (quoting Halper, 490 U.S. at 449) (emphasis supplied in Bae). 

After considering the history and nature of the statute

authorizing the Food and Drug Administration to ban persons from

participating in the pharmaceutical industry, the court concluded

that the order excluding Bae was consistent with a remedial

purpose and, therefore, not punitive. See id. at 494-96. 

The difference in approach between the Eleventh

Circuit, on one hand, and the Seventh and Tenth Circuits, on the

other hand, may be more one of emphasis than of substance.10

Certainly, the results reached in these three circuits are

entirely consistent and the courts' approaches put them on nearly

identical courses. The Eleventh Circuit, while eschewing the

Halper dichotomy in debarment situations, heeds Halper's 

animating principle. See, e.g., Reed, 937 F.2d at 578 

(describing the employment suspension as constituting "the rough

remedial justice permissible as a prophylactic governmental

action") (internal quotation marks and citations omitted). The

other two circuits embrace this same principle whilst departing

from a strict rendition of the Halper dichotomy. See, e.g., Bae, 

44 F.3d at 493. Moreover, the Seventh Circuit acknowledges that
 

10Indeed, both the Seventh and Tenth Circuits have rejected
double jeopardy challenges to debarment orders in the post-Halper 
era without discussing the dichotomy. See, e.g., United States 
v. Furlett, 974 F.2d 839, 844-45 (7th Cir. 1992); United States 
v. Bizzell, 921 F.2d 263, 267 (10th Cir. 1990). 

19

hybrid sanctions can pass constitutional muster: a modicum of

punitive effect will not poison a sanction that is essentially

remedial. See id. (conceding that "[t]he punitive effects of the 

[debarment] are merely incidental to its overriding purpose to

safeguard the integrity of the generic drug industry while

protecting public health"). This last statement is reminiscent

not only of Reed and Manocchio but also of the position advocated 

by the Second Circuit (albeit on different facts). See 

Hernandez-Fundora, 58 F.3d at 806 ("[T]he mere fact that a 

sanction imposed by prison officials has a punitive component

does not mean that the sanction constitutes `punishment' for

double jeopardy purposes.").

Despite these similarities in approach, we think it is

prudent to adopt one of the competing methodologies as a guide to

courts and litigants in this circuit. Writing with the added

illumination of Kurth Ranch, we conclude that, to the extent the 

circuits' approaches are inconsistent, the directness of the

Eleventh Circuit's analysis in Reed is preferable because it best 

effectuates the Supreme Court's admonition that the Halper 

dichotomy should not be applied too far afield from its original

context (monetary sanctions designed to make the government whole

for traceable losses). See Kurth Ranch, 114 S. Ct. at 1948. In 

addition, the more inclusive totality-of-the-circumstances test

provides a sounder barometer for measuring whether a debarment

order or an analogous non-monetary sanction constitutes

punishment. We so hold.

20

C. The Merits of the Claim. C. The Merits of the Claim. 

We turn next to the question whether the instant

debarment order constitutes punishment within the purview of the

Double Jeopardy Clause. This task does not require us to make a

blanket determination of whether all debarment orders are 

remedial as opposed to punitive. Rather, we shine the light of

our gleaned understanding on the particular sanction imposed

under the particular circumstances on the particular defendant in

order to ascertain its character. See Halper, 490 U.S. at 448 

(directing "a particularized assessment of the penalty imposed

and the purposes that the penalty may fairly be said to serve").

For this purpose, we assume but do not decide that the

debarment order and the nine "misapplication" counts lodged in

the indictment arise out of the same events and rest upon the

same elements.11

We conduct our inquiry by considering the totality of

the circumstances, including the source of the authority under

which the debarment is imposable, the goals underpinning the
 

11Under United States v. Dixon, 113 S. Ct. 2849 (1993), a 
double jeopardy claim does not take wing simply because the same
conduct underlies two sets of charges. Rather, the defendant
must demonstrate that the charges contain identical elements.
See id. at 2856, 2860. Stoller claims that the requisite 
identity exists here between the FDIC's administrative charges
and the first nine counts of the indictment (alleging violations
of 18 U.S.C. 656). The government disagrees. It suggests that
the elements are not congruent because 656 requires proof of a
misapplication of bank funds and willfulness or intent to injure 
the bank, whereas 1818(e) contains an element of loss causation
in lieu of the willfulness requirement. Since the debarment
order does not constitute punishment, see text infra, we emulate 
the court below and leave this issue unaddressed. See Stoller, 
906 F. Supp. at 40 n.2.

21

authorizing statute, the order itself, the purposes it serves,

and the circumstances attendant to its promulgation. See Kurth 

Ranch, 114 S. Ct. at 1946-47. In the course of this tamisage, we 

give weight to a variety of factors such as the severity of the

civil sanction; its relationship to legitimate, non-punitive

aims; the extent to which the legislature acted to deter

potential wrongdoers, or conversely, to shield the public; and

the nexus (if any) between the civil sanction and the crime that

it allegedly punishes. See id. Because our interest is in 

deterrating the overall nature of the sanction, no one factor,

standing alone, is likely to be determinative.

1. The authorizing statute, 12 U.S.C. 1818(e)(1), is 1.

reprinted in the appendix. The statute itself offers relatively

little guidance; it simply permits regulators to seek debarment

orders as long as three conditions are fulfilled. First, the

predicate conduct must consist of (a) violating a law,

regulation, or agency order, (b) engaging in (or condoning) an

unsafe or unsound banking practice, or (c) committing a breach of

fiduciary duty. See id. 1818(e)(1)(A). Second, the conduct 

must have (a) caused real or probable loss, (b) actually or

potentially prejudiced depositors' interests, or (c) resulted in

gain to the perpetrator. See id. 1818(e)(1)(B). Third, the 

conduct must have (a) involved personal dishonesty, or (b)

"demonstrate[d] willful or continuing disregard . . . for the

safety or soundness of" the financial institution. Id.  

1818(e)(1)(C). Whenever these three conditions coalesce, the

22

agency (here, the FDIC) may issue a debarment order. See id.  

1818(e)(1). Such an order will apply industry-wide unless

otherwise specified. See id. 1818(e)(7)(A). 

These conditions, on their face, are arguably

consistent with punishment and remediation alike. For example,

although the statute's culpability requirement is reminiscent of

the criminal code, such a requirement, in and of itself, does not

mandate a finding of punitive intent. See Hudson, 14 F.3d at 

542. By the same token, the statute's evident concern for both

depositors' interests and financial institutions' well-being

strongly suggests a remedial goal, but does not, in and of

itself, mandate a finding of remedial intent. What tends to tip

the balance is that, under 1818(e)(1), the authority to debar

is not tied to a finding that the targeted individual has

committed a crime. Just as the presence of an explicit link

between a civil penalty and the commission of a crime makes it

more likely that the penalty will be deemed punitive for double

jeopardy purposes, see Kurth Ranch, 114 S. Ct. at 1947, so, too, 

the fact that a civil penalty can be imposed whether or not the

targeted individual has committed a crime makes it more likely

that the penalty will be deemed remedial, see, e.g., Thomas v. 

Commissioner, 62 F.3d 97, 101 (4th Cir. 1995). 

In reaching the conclusion that 1818(e)(1), on its

face, displays colors more consistent with the remedial end of

the spectrum, we reject Stoller's argument that Congress's

failure to enact stringent standards circumscribing agency

23

discretion in respect to debarment renders debarment orders

punitive in nature. Simple logic refutes this proposition, and

the case law uniformly contradicts it.12 See, e.g., Bae, 44 

F.3d at 496 (characterizing a debarment order as remedial

notwithstanding the authorizing statute's lack of limiting

standards); Hudson, 14 F.3d at 542 (similar). 

The legislative history of 1818(e)(1) is helpful.

Fairly read, this history reflects congressional aims far more

compatible with remediation than with punishment. Congress first

enacted the proscription provision in 1966. The report that

accompanied the bill limned the reasons prompting the desired

reforms:

The Federal supervisory agencies in
varying degrees have been seriously
handicapped in their efforts to prevent
irresponsible and undesirable practices by
deficiencies in the statutory remedies.
Experience has often demonstrated that the
remedies now available to the Federal
supervisory agencies are not only too drastic
for use in many cases, but are also too
cumbersome to bring about prompt correction
and promptness is very often vitally
important.

S. Rep. No. 1482, 89th Cong., 2d Sess. 1, 5 (1966), reprinted in 

1966 U.S.C.C.A.N. 3532, 3537. When taken in light of the

Committee's manifold concerns about the safety of the nation's
 

12Stoller's reliance on United States v. Bizzell, 921 F.2d 
263 (10th Cir. 1990), is misplaced. There, the district court,
although concluding that the debarment order was not punitive,
rested its decision in part on statutory limitations attendant to
the government's proscriptive powers. See id. at 265. But the 
court of appeals did not adopt this rationale, affirming instead
on the general remedial purposes underpinning that statutory
scheme. See id. at 267. 

24

financial institutions, see id. at 3536-38, the quoted language 

comprises a patent indication that Congress intended debarment

primarily to protect depositors from scurrilous bank officials.

This is a vitally important datum: using a civil sanction to

safeguard the integrity of the banking industry and protect the

interests of depositors fulfills a remedial purpose. See Hudson, 

14 F.3d at 541-42.

Nothing in the Financial Institutions Reform, Recovery

and Enforcement Act of 1989 (FIRREA) alters this outlook. Though

FIRREA expanded the scope of possible proscription beyond the

offending official's own bailiwick and for the first time

authorized an industry-wide ban, see 12 U.S.C. 1818(e)(7), it 

did not otherwise change the substance of the debarment

provision. The only significant legislative history dealing with

the industry-wide ban addresses the exceptions regulators are

empowered to make and explains them in essentially remedial

terms. See, e.g., H.R. Rep. No. 54(I), 101st Cong., 1st Sess. 1, 

468, (1989), reprinted in 1989 U.S.C.C.A.N. 86, 264; H.R. Conf. 

Rep. No. 222, 101st Cong., 1st Sess. 393, 440 (1989), reprinted 

in 1989 U.S.C.C.A.N. 432, 479. The other changes accomplished by 

Title IX of FIRREA are a mixed bag and, in the aggregate, shed

little illumination. The short of it is that the annals of

FIRREA offer no convincing reason to infer that Congress intended

to alter the fundamental (remedial) nature of the debarment

provision.

Stoller resists this conclusion, plucking a single

25

sentence from FIRREA's lengthy legislative history. The House

Report, in its introduction to FIRREA Title IX, states that

"[t]his Title gives the regulators and the Justice Department the

tools which they need . . . to punish culpable individuals, to

turn this situation around, and to prevent these tremendous

losses to the Federal deposit insurance funds from ever again

recurring." H.R. Rep. No. 54(I), supra, 1989 U.S.C.C.A.N. at 

262. But this language applies to Title IX as a whole, not to

the debarment provision per se. The immediately preceding

sentence explains that Title IX is intended both to enhance the

FDIC's regulatory powers and to strengthen applicable criminal

justice provisions with a view to "restoring public confidence in

the nation's financial system and serv[ing] to protect the public

interest." Id. Read in tandem, these sentences suggest that 

Congress visualized industry-wide debarment as a remedial device,

notwithstanding that the bill included other emendations that

were calculated to increase punishments.

To sum up, the legislative history undergirding the

debarment provision indicates that Congress gave the FDIC removal

power for remedial purposes, and FIRREA does not suggest that

Congress experienced a change of heart.

2. Double jeopardy problems must be examined in their 2.

actual application. See Halper, 490 U.S. at 447. Moving from 

the general to the specific, we inspect the circumstances under

which the FDIC sanctioned Stoller. Our assay is hampered because

the regulators' decisions are opaque in certain respects. The

26

ALJ did little more than find that the statutory preconditions to

proscription had been met. Similarly, the Board's initial

decision merely stated that "the serious nature of [Stoller's]

unsafe or unsound conduct and serious breaches of fiduciary duty

merit prohibition from participating in the conduct of the

affairs of any other federally insured depository institution."

In re Stoller, No. 90-115e, at 23-24 (FDIC Feb. 18, 1992) (Board 

Dec. I). This explanation seems equally consistent with either

remedial or punitive aims; the Board might have thought Stoller,

as a continuing participant in the banking community, likely to

present an ongoing threat to the public, or it might simply have

thought that he deserved severe punishment.

The Board's second decision furnishes a more

transparent window into its cerebrations, and resolves this

amphiboly. That decision (in which the Board extended Stoller's

exile by prohibiting him from acting as counsel to any financial

institution) persuasively demonstrates that the Board intended

debarment to serve a remedial end. The Board reasoned that the

very nature of a lawyer's relationship with a bank provides a

unique opportunity for double dealing. See In re Stoller, No. 

90-115e, at 9 (FDIC Sept. 22, 1992) (Board Dec. II). Hence,

debarment orders should sweep broadly to ensure that rogue

lawyers do not have repeated opportunities to bilk banks. See 

id. at 8. Because "an attorney representing a financial 

institution, like the institution's directors and officers,

occupies a position of trust and has important fiduciary

27

obligations to the financial institution," id. at 9, the attorney 

has "a significant opportunity to harm the institution." Id. 

Applying these principles, the Board ordered debarment in the

most wide-ranging terms. It wrote "that Stoller could not be

trusted to put the bank's interests before his own." Id. at 10. 

On this basis, the order seems unquestionably to be remedial.

Struggling against this pointed explication of the

Board's rationale, Stoller asseverates that the debarment order

cannot be viewed as remedial because the FDIC did not assess the

danger that continued involvement on his part posed to the

banking system or to depositors. His asseveration lacks force.

In the first place, the FDIC is not required to make

specific findings on the magnitude of a potential threat to the

nation's financial institutions. Halper expressly recognizes 

that civil sanctions need not be precisely calibrated in order to

survive scrutiny under the Double Jeopardy Clause as long as they

work "rough remedial justice." 490 U.S. at 446. We think that

this principle is fully transferable to the debarment context.

When, as now, the government demonstrates a pattern of systematic

wrongdoing involving large sums of money, a debarment order may

properly be said to work rough remedial justice without a

detailed prognostication regarding the probable extent of the

wrongdoer's future misconduct, if unchecked. See United States 

v. Furlett, 974 F.2d 839, 844 (7th Cir. 1992); Manocchio, 961 

F.2d at 1542; see also United States v. Winter, 22 F.3d 15, 17 

(1st Cir. 1994) ("It is common wisdom that past is prologue,

28

foreshadowing the future."). Here, the Board, based on Stoller's

pervasive misconduct, could reasonably conclude that he

represented a major threat to the banking industry, and that a

broad debarment order would serve prophylactic purposes.

In the second place, Stoller's claim that the Board did

not consider the risk he presented to the banking industry is

incorrect as a matter of fact. The Board's attention to this

issue is not only evident from the parts of the decisions that we

have cited, but it is also made manifest by the Board's

discussion of a possible reprieve from the industry-wide ban. In

that regard, the Board wrote that the FDIC would have a future

opportunity to determine whether Stoller "could perform work on

behalf of [federally insured depository institutions] without

undue risk to those institutions." Board Dec. II at 11. This

statement not only reflects the Board's worries about imperilling

the public but also highlights the conditional nature of the ban

a fact that itself militates in favor of a finding that the

sanction is remedial as opposed to punitive.13 See Hudson, 14 

F.3d at 542.

3. Where, as here, double jeopardy analysis proceeds 3.

under an appraisal of the totality of the circumstances, a civil

sanction need not be solely remedial to pass constitutional

muster. In other words, the fact that something akin to
 

13We do not mean to suggest that a permanent ban would
necessarily be punitive. See Bae, 44 F.3d at 495 (explaining 
that "the duration or severity of an employment restriction will
not mark it as punishment where it is intended to further a
legitimate governmental purpose").

29

punishment occurs along with, and incidental to, a sanction's

overriding remedial purpose will not transform a permissible

civil penalty into a prohibited multiple punishment. See 

Hernandez-Fundora, 58 F.3d at 806; Bae, 44 F.3d at 493. Having 

examined 1818(e)(1), the applicable legislative history, the

circumstances attendant to Stoller's duplicity, and the rationale

underlying the Board's issuance of the specific debarment order

at issue here, we discern a single unifying thread: protection

of the integrity of the nation's financial institutions. This

comports with the root purpose of debarment: to purge sensitive

industries of corruption and thereby protect the public. This

purpose, evident here, is essentially remedial in nature.

We need go no further. Although the durationally

indefinite order of proscription directed against Stoller is

harsh, we do not believe that it is disproportionate to the

remedial goals of 1818(e)(1). Nor is the debarment order out

of proportion to Stoller's wrongdoing. This is a salient

consideration because an individual's misconduct frequently

informs the need for remediation. See Hudson, 14 F.3d at 542; 

Furlett, 974 F.2d at 844. Here, Stoller caused the Bank to 

suffer extensive losses, and did so by the most devious means 

playing shell games with real estate trusts, abusing a position

of trust, and duping others by concealing his interests in

financial transactions. In our judgment, the Board's decision to

ban Stoller indefinitely from all association with the banking

industry "reasonably can be viewed as a remedial measure

30

commensurate with his wrongdoing." Furlett, 974 F.2d at 844. 

Put another way, industry-wide debarment, in the circumstances of

this case, produces rough remedial justice.

IV. CONCLUSION IV. CONCLUSION

When the powers of government are arrayed against an

individual, courts must be vigilant to ensure that the individual

is not punished twice for the same offense through an artifice in

which one punishment masquerades as a civil sanction. Yet the

fear of potential abuse should not be allowed to sweep away

common sense. Regulators who act principally to safeguard the

integrity of the industries that they oversee or to shield the

public from the machinations of unscrupulous persons are

representatives of the sovereign but they are not purveyors of

punishment in a constitutionally relevant sense. In the end,

then, courts must distinguish carefully between those sanctions

that constitute impermissible exercises of the government's power

to punish and those that constitute permissible exercises of the

government's remedial authority (even if effectuating a specific

remedy sometimes carries with it an unavoidable component of

deterrence or retribution).

Taking into account the totality of the circumstances,

we hold that the debarment order imposed by the FDIC is

predominantly remedial in nature. Because it does not constitute

a punishment under appropriate double jeopardy analysis, the

district court did not err in denying the motion to dismiss

31

various counts contained in the indictment.14

Affirmed. Affirmed. 

 

14We note in passing that we would reach an identical result
if we evaluated the debarment order under the Hudson/Bae 
variation on the Halper theme instead of under the totality of 
the circumstances. 

32

STATUTORY APPENDIX STATUTORY APPENDIX

I. Debarment. I. Debarment. 

(1) Authority to issue order.--Whenever the appropriate
Federal banking agency determines that--
(A) any institution-affiliated party has, directly
or indirectly--
(i) violated--
(I) any law or regulation;
(II) any cease-and-desist order which
has become final;
(III) any condition imposed in writing
by the appropriate Federal banking agency in
connection with the grant of any application
or other request by such depository
institution; or
(IV) any written agreement between such
depository institution and such agency;
(ii) engaged or participated in any unsafe or
unsound practice in connection with any insured
depository institution or business institution; or
(iii) committed or engaged in any act,
omission, or practice which constitutes a breach
of such party's fiduciary duty;
(B) by reason of the violation, practice, or
breach described in any clause of subparagraph (A)--
(i) such insured depository institution or
business institution has suffered or will probably
suffer financial loss or other damage;
(ii) the interests of the insured depository
institution's depositors have been or could be
prejudiced; or
(iii) such party has received financial gain
or other benefit by reason of such violation,
practice, or breach; and
(C) such violation, practice, or breach--
(i) involves personal dishonesty on the part
of such party; or
(ii) demonstrates willful or continuing
disregard by such party for the safety or
soundness of such insured depository institution
or business institution,

the agency may serve upon such party a written notice of the
agency's intention to remove such party from office or to
prohibit any further participation by such party, in any manner,
in the conduct of the affairs of any insured depository
institution.

12 U.S.C. 1818(e)(1) (1994).

33

II. Industry-wide Prohibition. II. Industry-wide Prohibition. 

(A) In general.--Except as provided in subparagraph
(B), any person who, pursuant to an order issued under this
subsection . . . has been removed or suspended from office in an
insured depository institution or prohibited from participating
in the conduct of the affairs of an insured depository
institution may not, while such order is in effect, continue or
commence to hold any office in, or participate in any manner in
the conduct of the affairs of . . . any insured depository
institution . . . .
(B) Exception if agency provides written consent.--If,
on or after the date an order is issued under this subsection
which removes or suspends from office any institution-affiliated
party or prohibits such party from participating in the conduct
of the affairs of an insured depository institution, such party
receives the written consent of [the relevant federal agencies],
subparagraph (A) shall, to the extent of such consent, cease to
apply to such party with respect to the institution described in
each written consent.

12 U.S.C. 1818(e)(7) (1994).

III. Offenses Charged in the Indictment. III. Offenses Charged in the Indictment. 

The superseding indictment handed up on January 4,

1995, charged Stoller with violating various criminal statutes.

Those statutes provide in pertinent part:

Whoever, being an officer, director, agent or
employee of . . . any . . . national bank or insured
bank . . . embezzles, abstracts, purloins or willfully
misapplies any of the moneys, funds or credits of such
bank . . . shall be [punished as provided by law] . . .
.

18 U.S.C. 656 (1988).

Whoever . . . as an officer, director, employee,
agent, or attorney of a financial institution,
corruptly solicits or demands for the benefit of any
person, or corruptly accepts or agrees to accept,
anything of value from any person, intending to be
influenced or rewarded in connection with any business
or transaction of such institution . . . shall be
[punished as provided by law] . . . .

18 U.S.C. 215(a) (1988).

Whoever makes any false entry in any book, report,

34

or statement of [a federally insured] bank with intent
to injure or defraud such bank, or any other company,
body politic or corporate, or any individual person, or
to deceive any officer of such bank, or the . . .
Federal Deposit Insurance Corporation . . . [s]hall be
[punished as provided by law].

18 U.S.C. 1005 (1988).

(a) Whoever commits an offense against
the United States or aids, abets, counsels,
commands, induces or procures its commission,
is punishable as a principal.

(b) Whoever willfully causes an act to
be done which if directly performed by him or
another would be an offense against the
United States, is punishable as a principal.

18 U.S.C. 2 (1988).

35